# COMMONWEALTH EDISON CO. ET AL. *v.* MONTANA ET AL.

No. 80–581.   Argued March 30, 1981—Decided July 2, 1981

610

MARSHALL, J., delivered the opinion of the Court in which BURGER, C. J., and BRENNAN, STEWART, WHITE, and REHNQUIST, JJ., joined. WHITE, J., filed a concurring opinion, *post*, p. 637. BLACKMUN, J., filed a dissenting opinion, in which POWELL and STEVENS, JJ., joined, *post*, p. 638.

*William P. Rogers* argued the cause for appellants. With him on the briefs were *William R. Glendon, Stanley Godofsky, Stephen Froling, James N. Benedict, Patrick F. Hooks, William J. Carl,* and *George J. Miller.*

*Mike Greely,* Attorney General of Montana, argued the cause for appellees. With him on the brief were *Mike McCrath* and *Mike McCarter,* Assistant Attorneys General, and *A. Raymond Randolph, Jr.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Minnesota et al. by *Warren Spannaus,* Attorney General of Minnesota, and *Kent G. Harbison* and *Karen G. Schanfield,* Special Assistant Attorneys General, *Thomas J. Miller,* Attorney General of Iowa, and *Bronson C. La Follette,* Attorney General of Wisconsin; for the State of Kansas by *Robert T. Stephan,* Attorney General, and *Bruce E. Miller,* Deputy Attorney General; for the State of New Jersey et al. by *John J. Degnan,* Attorney General of New Jersey, *Stephen Skillman,* Assistant Attorney General, and *Claude E. Solomon,* Deputy Attorney General, *Frank J. Kelley,* Attorney General of Michigan, *Robert A. Derengoski,* Solicitor General, and *Arthur E. D'Hondt* and *John M. Dempsey,* Assistant Attorneys General; for the State of Texas by *Mark White,* Attorney General, *John Stuart Fryer, James R. Meyers,* and *Justin Andrew Kever,* Assistant Attorneys General, *John W. Fainter, Jr.,* First Assistant Attorney General, and *Richard E. Gray III,* Executive Assistant Attorney General; and for Robert W. Edgar et al. by *Lewis B. Kaden.*

Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General McCree, Acting Assistant Attorney General Liotta,*

JUSTICE MARSHALL delivered the opinion of the Court.

Montana, like many other States, imposes a severance tax on mineral production in the State. In this appeal, we consider whether the tax Montana levies on each ton of coal mined in the State, Mont. Code Ann. § 15–35–101 *et seq.* (1979), violates the Commerce and Supremacy Clauses of the United States Constitution.

I

Buried beneath Montana are large deposits of low-sulfur coal, most of it on federal land. Since 1921, Montana has imposed a severance tax on the output of Montana coal mines, including coal mined on federal land. After commissioning a study of coal production taxes in 1974, see House Resolutions Nos. 45 and 93, Senate Resolution No. 83, 1974 Mont. Laws 1619–1620, 1653–1654, 1683–1684 (Mar. 14 and

*Deputy Solicitor General Claiborne, Edwin S. Kneedler, Edward J. Shawaker,* and *Christopher Kirk Harris;* for the State of New Mexico by *Jeff Bingaman,* Attorney General, *Thomas L. Dunigan,* Deputy Attorney General, *Denise Fort,* Assistant Attorney General, and *Paul L. Bloom,* Special Assistant Attorney General; for the State of North Dakota et al. by *Robert O. Welfald,* Attorney General of North Dakota, and *Leo F. J. Wilking,* Assistant Attorney General, and *Chauncey H. Browning, Jr.,* Attorney General of West Virginia; for the State of Wyoming et al. by *John D. Troughton,* Attorney General of Wyoming, *Mary B. Guthrie* and *Dennis M. Boal,* Assistant Attorneys General, *Nancy D. Freudenthal,* Special Assistant Attorney General, and *Steven F. Freudenthal, J. D. MacFarlane,* Attorney General of Colorado, *Richard H. Bryan,* Attorney General of Nevada, *David H. Leroy,* Attorney General of Idaho, *Kenneth O. Eikenberry,* Attorney General of Washington, and *Dave Frohnmayer,* Attorney General of Oregon; for Max Baucus et al. by *R. Stephen Browning, Hamilton P. Fox III,* and *Peter Van N. Lockwood;* for the Environmental Defense Fund et al. by *David B. Roe;* for Malcolm Wallop et al. by *Ann B. Vance* and *Dennis Charles Stickley;* for the Western Conference of the Council of State Governments by *John E. Thorson.*

Briefs of *amici curiae* were filed by *Richard Anthony Baenen, Edward M. Fogarty,* and *Thomas J. Lynaugh,* for the Crow Tribe of Indians; and by *David E. Engdahl* for the Western Governors' Policy Office.

16, 1974); Montana Legislative Council, Fossil Fuel Taxation (1974), in 1975, the Montana Legislature enacted the tax schedule at issue in this case. Mont. Code Ann. § 15–35–103 (1979). The tax is levied at varying rates depending on the value, energy content, and method of extraction of the coal, and may equal, at a maximum, 30% of the "contract sales price."[1] Under the terms of a 1976 amendment to the Montana Constitution, after December 31, 1979, at least 50% of the revenues generated by the tax must be paid into a permanent trust fund, the principal of which may be appropriated only by a vote of three-fourths of the members of each house of the legislature. Mont. Const., Art. IX, § 5.

Appellants, 4 Montana coal producers and 11 of their out-of-state utility company customers, filed these suits in Montana state court in 1978. They sought refunds of over $5.4 million in severance taxes paid under protest, a declaration that the tax is invalid under the Supremacy and Commerce Clauses, and an injunction against further collection of the tax. Without receiving any evidence, the court upheld the tax and dismissed the complaints.

On appeal, the Montana Supreme Court affirmed the judgment of the trial court. —— Mont. ——, 615 P. 2d 847 (1980). The Supreme Court held that the tax is not subject to scrutiny under the Commerce Clause[2] because it is imposed on the severance of coal, which the court characterized as an intrastate activity preceding entry of the coal into interstate

---

[1] Under Mont. Code Ann. § 15–35–103 (1979), the value of the coal is determined by the "contract sales price" which is defined as "the price of coal extracted and prepared for shipment f. o. b. mine, excluding the amount charged by the seller to pay taxes paid on production . . . ." § 15–35–102 (1). Taxes paid on production are defined in § 15–35–102 (6). Because production taxes are excluded from the computation of the value of the coal, the effective rate of the tax is lower than the statutory rate.

[2] "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . ." U. S. Const., Art. I, § 8, cl. 3.

commerce. In this regard, the Montana court relied on this Court's decisions in *Heisler* v. *Thomas Colliery Co.*, 260 U. S. 245 (1922), *Oliver Iron Mining Co.* v. *Lord*, 262 U. S. 172 (1923), and *Hope Natural Gas Co.* v. *Hall*, 274 U. S. 284 (1927), which employed similar reasoning in upholding state severance taxes against Commerce Clause challenges. As an alternative basis for its resolution of the Commerce Clause issue, the Montana court held, as a matter of law, that the tax survives scrutiny under the four-part test articulated by this Court in *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977). The Montana court also rejected appellants' Supremacy Clause[3] challenge, concluding that appellants had failed to show that the Montana tax conflicts with any federal statute.

We noted probable jurisdiction, 449 U. S. 1033 (1980), to consider the important issues raised. We now affirm.

## II

### A

As an initial matter, appellants assert that the Montana Supreme Court erred in concluding that the Montana tax is not subject to the strictures of the Commerce Clause. In appellants' view, *Heisler's* "mechanical" approach, which looks to whether a state tax is levied on goods prior to their entry into interstate commerce, no longer accurately reflects the law. Appellants contend that the correct analysis focuses on whether the challenged tax substantially affects interstate commerce, in which case it must be scrutinized under the *Complete Auto Transit* test.

We agree that *Heisler's* reasoning has been undermined by more recent cases. The *Heisler* analysis evolved at a time when the Commerce Clause was thought to prohibit the States from imposing any direct taxes on interstate commerce.

---

[3] The "Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . . ." U. S. Const., Art. VI, cl. 2.

See, *e. g., Helson & Randolph v. Kentucky,* 279 U. S. 245, 250–252 (1929); *Ozark Pipe Line Corp. v. Monier,* 266 U. S. 555, 562 (1925). Consequently, the distinction between intrastate activities and interstate commerce was crucial to protecting the States' taxing power.[4]

The Court has, however, long since rejected any suggestion that a state tax or regulation affecting interstate commerce is immune from Commerce Clause scrutiny because it attaches only to a "local" or intrastate activity. See *Hunt* v. *Washington Apple Advertising Comm'n,* 432 U. S. 333, 350 (1977); *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 141–142 (1970); *Nippert* v. *Richmond,* 327 U. S. 416, 423–424 (1946). Correspondingly, the Court has rejected the notion that state taxes levied on interstate commerce are *per se* invalid. See, *e. g., Washington Revenue Dept.* v. *Association of Wash. Stevedoring Cos.,* 435 U. S. 734 (1978); *Complete Auto Transit, Inc.* v. *Brady, supra.* In reviewing Commerce Clause challenges to state taxes, our goal has instead been to "establish a consistent and rational method of inquiry" focusing on "the practical effect of a challenged tax." *Mobil Oil Corp.* v. *Commissioner of Taxes,* 445 U. S. 425, 443 (1980). See *Moorman Mfg. Co.* v. *Bair,* 437 U. S. 267, 276–281 (1978); *Washington Revenue Dept.* v. *Association of Wash. Stevedor-*

---

[4] The *Heisler* Court explained that any other approach would "nationalize all industries, it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West and its meats, the cotton of the South, the shoes of Massachusetts and the woolen industries of other States, at the very inception of their production or growth, that is, the fruits unpicked, the cotton and wheat ungathered, hides and flesh of cattle yet 'on the hoof,' wool yet unshorn, and coal yet unmined, because they are in varying percentages destined for and surely to be exported to States other than those of their production." 260 U. S., at 259–260.

Of course, the "fruits of California" and the "wheat of the West" have long since been held to be within the reach of the Commerce Clause. *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137 (1970); *Wickard* v. *Filburn,* 317 U. S. 111 (1942).

*ing Cos., supra,* at 743–751; *Complete Auto Transit, Inc.* v. *Brady, supra,* at 277–279. We conclude that the same "practical" analysis should apply in reviewing Commerce Clause challenges to state severance taxes.

In the first place, there is no real distinction—in terms of economic effects—between severance taxes and other types of state taxes that have been subjected to Commerce Clause scrutiny.[5] See, *e. g., Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U. S. 157 (1954); *Joseph* v. *Carter & Weekes Stevedoring Co.,* 330 U. S. 422 (1947), *Puget Sound Stevedoring Co.* v. *State Tax Comm'n,* 302 U. S. 90 (1937), both overruled in *Washington Revenue Dept.* v. *Association of Wash. Stevedoring Cos., supra.*[6] State taxes levied on a "local" activity preceding entry of the goods into interstate commerce may substantially affect interstate commerce, and this effect is the proper focus of Commerce Clause inquiry. See *Mobil Oil Corp.* v. *Commissioner of Taxes, supra,* at 443. Second, this Court has acknowledged that "a State has a significant interest in exacting from interstate commerce its fair share of the cost of state government," *Washington Revenue Dept.* v. *Association of Wash. Stevedoring Cos., supra,* at 748. As the Court has stated, " '[e]ven interstate business must pay its way.' " *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 254 (1938), quoting *Postal Telegraph-Cable*

---

[5] The *Heisler* approach has been criticized as unresponsive to economic reality. See Hellerstein, Constitutional Constraints on State and Local Taxation of Energy Resources, 31 Nat. Tax. J. 245, 249 (1978); Brown, The Open Economy: Justice Frankfurter and the Position of the Judiciary, 67 Yale L. J. 219, 232–233 (1957); Developments in the Law: Federal Limitations on State Taxation of Interstate Business, 75 Harv. L. Rev. 953, 970–971 (1962) (Developments).

[6] The *Heisler* approach has forced the Court to draw distinctions that can only be described as opaque. Compare, for example, *East Ohio Gas Co.* v. *Tax Comm'n,* 283 U. S. 465 (1931) (movement of gas into local supply lines at reduced pressure constitutes local business), with *State Tax Comm'n* v. *Interstate Natural Gas Co.,* 284 U. S. 41 (1931) (movement of gas into local supply lines constitutes part of interstate business).

*Co.* v. *Richmond,* 249 U. S. 252, 259 (1919). Consequently, the *Heisler* Court's concern that a loss of state taxing authority would be an inevitable result of subjecting taxes on "local" activities to Commerce Clause scrutiny is no longer tenable.

We therefore hold that a state severance tax is not immunized from Commerce Clause scrutiny by a claim that the tax is imposed on goods prior to their entry into the stream of interstate commerce. Any contrary statements in *Heisler* and its progeny are disapproved.[7] We agree with appellants that the Montana tax must be evaluated under *Complete Auto Transit's* four-part test. Under that test, a state tax does not offend the Commerce Clause if it "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to services provided by the State." 430 U. S., at 279.

## B

Appellants do not dispute that the Montana tax satisfies the first two prongs of the *Complete Auto Transit* test. As the Montana Supreme Court noted, "there can be no argument here that a substantial, in fact, the only nexus of the severance of coal is established in Montana." —— Mont., at ——, 615 P. 2d, at 855. Nor is there any question here regarding apportionment or potential multiple taxation, for as the state court observed, "the severance can occur in no other state" and "no other state can tax the severance." *Ibid.* Appellants do contend, however, that the Montana tax is invalid under the third and fourth prongs of the *Complete Auto Transit* test.

Appellants assert that the Montana tax "discriminate[s] against interstate commerce" because 90% of Montana coal is shipped to other States under contracts that shift the tax burden primarily to non-Montana utility companies and thus

---

[7] This is not to suggest, however, that *Heisler* and its progeny were wrongly decided.

to citizens of other States. But the Montana tax is computed at the same rate regardless of the final destination of the coal, and there is no suggestion here that the tax is administered in a manner that departs from this evenhanded formula. We are not, therefore, confronted here with the type of differential tax treatment of interstate and intrastate commerce that the Court has found in other "discrimination" cases. See, e. g., *Maryland* v. *Louisiana,* 451 U. S. 725 (1981); *Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318 (1977); cf. *Lewis* v. *BT Investment Managers, Inc.,* 447 U. S. 27 (1980); *Philadelphia* v. *New Jersey,* 437 U. S. 617 (1978).

Instead, the gravamen of appellants' claim is that a state tax must be considered discriminatory for purposes of the Commerce Clause if the tax burden is borne primarily by out-of-state consumers. Appellants do not suggest that this assertion is based on any of this Court's prior discriminatory tax cases. In fact, a similar claim was considered and rejected in *Heisler.* There, it was argued that Pennsylvania had a virtual monopoly of anthracite coal and that, because 80% of the coal was shipped out of State, the tax discriminated against and impermissibly burdened interstate commerce. 260 U. S., at 251–253. The Court, however, dismissed these factors as "adventitious considerations." *Id.,* at 259. We share the *Heisler* Court's misgivings about judging the validity of a state tax by assessing the State's "monopoly" position or its "exportation" of the tax burden out of State.

The premise of our discrimination cases is that "[t]he very purpose of the Commerce Clause was to create an area of free trade among the several States." *McLeod* v. *J. E. Dilworth Co.,* 322 U. S. 327, 330 (1944). See *Hunt* v. *Washington Apple Advertising Comm'n,* 432 U. S., at 350; *Boston Stock Exchange* v. *State Tax Comm'n, supra,* at 328. Under such a regime, the borders between the States are essentially irrelevant. As the Court stated in *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229, 255 (1911), " 'in matters of foreign

and interstate commerce there are no state lines.' " See *Boston Stock Exchange* v. *State Tax Comm'n, supra,* at 331–332. Consequently, to accept appellants' theory and invalidate the Montana tax solely because most of Montana's coal is shipped across the very state borders that ordinarily are to be considered irrelevant would require a significant and, in our view, unwarranted departure from the rationale of our prior discrimination cases.

Furthermore, appellants' assertion that Montana may not "exploit" its "monopoly" position by exporting tax burdens to other States, cannot rest on a claim that there is need to protect the out-of-state consumers of Montana coal from discriminatory tax treatment. As previously noted, there is no real discrimination in this case; the tax burden is borne according to the amount of coal consumed and not according to any distinction between in-state and out-of-state consumers. Rather, appellants assume that the Commerce Clause gives residents of one State a right of access at "reasonable" prices to resources located in another State that is richly endowed with such resources, without regard to whether and on what terms residents of the resource-rich State have access to the resources. We are not convinced that the Commerce Clause, of its own force, gives the residents of one State the right to control in this fashion the terms of resource development and depletion in a sister State. Cf. *Philadelphia* v. *New Jersey, supra,* at 626.[8]

---

[8] Nor do we share appellants' apparent view that the Commerce Clause injects principles of antitrust law into the relations between the States by reference to such imprecise standards as whether one State is "exploiting" its "monopoly" position with respect to a natural resource when the flow of commerce among them is not otherwise impeded. The threshold questions whether a State enjoys a "monopoly" position and whether the tax burden is shifted out of State, rather than borne by in-state producers and consumers, would require complex factual inquiries about such issues as elasticity of demand for the product and alternative sources of supply. Moreover, under this approach, the constitutionality of a state tax could

In any event, appellants' discrimination theory ultimately collapses into their claim that the Montana tax is invalid under the fourth prong of the *Complete Auto Transit* test: that the tax is not "fairly related to the services provided by the State." 430 U. S., at 279. Because appellants concede that Montana may impose *some* severance tax on coal mined in the State,[9] the only remaining foundation for their discrimination theory is a claim that the tax burden borne by the out-of-state consumers of Montana coal is excessive. This is, of course, merely a variant of appellants' assertion that the Montana tax does not satisfy the "fairly related" prong of the *Complete Auto Transit* test, and it is to this contention that we now turn.

Appellants argue that they are entitled to an opportunity to prove that the amount collected under the Montana tax is not fairly related to the additional costs the State incurs because of coal mining.[10] Thus, appellants' objection is to

well turn on whether the in-state producer is able, through sales contracts or otherwise, to shift the burden of the tax forward to its out-of-state customers. As the Supreme Court of Montana observed, "[i]t would be strange indeed if the legality of a tax could be made to depend on the vagaries of the terms of contracts." —— Mont. ——, ——, 615 P. 2d 847, 856 (1980). It has been suggested that the "formidable evidentiary difficulties in appraising the geographical distribution of industry, with a view toward determining a state's monopolistic position, might make the Court's inquiry futile." Developments, *supra* n. 5, at 970. See Hellerstein, *supra* n. 5. at 248–249.

[9] Since this Court has held that interstate commerce must bear its fair share of the state tax burden, see *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 254 (1938), appellants cannot argue that *no* severance tax may be imposed on coal primarily destined for interstate commerce.

[10] Appellants expect to show that the "legitimate local impact costs [of coal mining]—for schools, roads, police, fire and health protection, and environmental protection and the like—might amount to approximately 2 [cents] per ton, compared to present average revenues from the severance tax alone of over $2.00 per ton." Brief for Appellants 12. Appellants

the *rate* of the Montana tax, and even then, their only complaint is that the *amount* the State receives in taxes far exceeds the *value* of the services provided to the coal mining industry. In objecting to the tax on this ground, appellants may be assuming that the Montana tax is, in fact, intended to reimburse the State for the cost of specific services furnished to the coal mining industry. Alternatively, appellants could be arguing that a State's power to tax an activity connected to interstate commerce cannot exceed the value of the services specifically provided to the activity. Either way, the premise of appellants' argument is invalid. Furthermore, appellants have completely misunderstood the nature of the inquiry under the fourth prong of the *Complete Auto Transit* test.

The Montana Supreme Court held that the coal severance tax is "imposed for the general support of the government." —— Mont., at ——, 615 P. 2d, at 856, and we have no reason to question this characterization of the Montana tax as a general revenue tax.[11] Consequently, in reviewing appellants' contentions, we put to one side those cases in which the Court reviewed challenges to "user" fees or "taxes" that were designed and defended as a specific charge imposed by the State for the use of state-owned or state-provided transportation or other facilities and services. See, *e. g., Evans-*

---

contend that inasmuch as 50% of the revenues generated by the Montana tax is "cached away, in effect, for unrelated and unknown purposes," it is clear that the tax is not fairly related to the services furnished by the State. Reply Brief for Appellants 8.

At oral argument before the Montana Supreme Court, appellants' counsel suggested that a tax of "perhaps twelve and a half to fifteen percent of the value of the coal" would be constitutional. —— Mont., at ——, 615 P. 2d, at 851.

[11] Contrary to appellants' suggestion, the fact that 50% of the proceeds of the severance tax is paid into a trust fund does not undermine the Montana court's conclusion that the tax is a general revenue tax. Nothing in the Constitution prohibits the people of Montana from choosing to allocate a portion of current tax revenues for use by future generations.

*ville-Vanderburgh Airport Authority Dist.* v. *Delta Airlines, Inc.,* 405 U. S. 707 (1972); *Clark* v. *Paul Gray, Inc.,* 306 U. S. 583 (1939); *Ingels* v. *Morf,* 300 U. S. 290 (1937).[12]

This Court has indicated that States have considerable latitude in imposing general revenue taxes. The Court has, for example, consistently rejected claims that the Due Process Clause of the Fourteenth Amendment stands as a barrier against taxes that are "unreasonable" or "unduly burdensome." See, *e. g., Pittsburgh* v. *Alco Parking Corp.,* 417 U. S. 369 (1974); *Magnano Co.* v. *Hamilton,* 292 U. S. 40 (1934); *Alaska Fish Salting & By-Products Co.* v. *Smith,* 255 U. S. 44 (1921). Moreover, there is no requirement under the Due Process Clause that the amount of general revenue taxes collected from a particular activity must be reasonably related to the value of the services provided to the activity. Instead, our consistent rule has been:

> "Nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied. .
>
> "A tax is not an assessment of benefits. It is, as we

---

[12] As the Court has stated, "such imposition, although termed a tax, cannot be tested by standards which generally determine the validity of taxes." *Interstate Transit, Inc.* v. *Lindsey,* 283 U. S. 183, 190 (1931). Because such charges are purportedly assessed to reimburse the State for costs incurred in providing specific quantifiable services, we have required a showing, based on factual evidence in the record, that "the fees charged do not appear to be manifestly disproportionate to the services rendered . . . ." *Clark* v. *Paul Gray, Inc.,* 306 U. S., at 599. See *id.,* at 598–600; *Ingels* v. *Morf,* 300 U. S., at 296–297.

One commentator has suggested that these "user" charges "are not true revenue measures and . . . the considerations applicable to ordinary tax measures do not apply." P. Hartman, State Taxation of Interstate Commerce 20, n. 72 (1953). Instead, "user" fees "partak[e] . . . of the nature of a rent charged by the State, based upon its proprietary interest in its public property, [rather] than of a tax, as that term is thought of in a technical sense." *Id.,* at 122. See generally *id.,* at 122–130.

have said, a means of distributing the burden of the cost of government. The only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes. Any other view would preclude the levying of taxes except as they are used to compensate for the burden on those who pay them, and would involve abandonment of the most fundamental principle of government—that it exists primarily to provide for the common good." *Carmichael* v. *Southern Coal & Coke Co.,* 301 U. S. 495, 521–523 (1937) (citations and footnote omitted).

See *St. Louis & S. W. R. Co.* v. *Nattin,* 277 U. S. 157, 159 (1928); *Thomas* v. *Gay,* 169 U. S. 264, 280 (1898).

There is no reason to suppose that this latitude afforded the States under the Due Process Clause is somehow divested by the Commerce Clause merely because the taxed activity has some connection to interstate commerce; particularly when the tax is levied on an activity conducted within the State. "The exploitation by foreign corporations [or consumers] of intrastate opportunities under the protection and encouragement of local government offers a basis for taxation as unrestricted as that for domestic corporations." *Ford Motor Co.* v. *Beauchamp,* 308 U. S. 331, 334–335 (1939); see also *Ott* v. *Mississippi Valley Barge Line Co.,* 336 U. S. 169 (1949). To accept appellants' apparent suggestion that the Commerce Clause prohibits the States from requiring an activity connected to interstate commerce to contribute to the general cost of providing governmental services, as distinct from those costs attributable to the taxed activity, would place such commerce in a privileged position. But as we recently reiterated, " '[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it in-

creases the cost of doing business.' " *Colonial Pipeline Co.* v. *Traigle,* 421 U. S. 100, 108 (1975), quoting *Western Live Stock* v. *Bureau of Revenue,* 303 U. S., at 254. The "just share of state tax burden" includes sharing in the cost of providing "police and fire protection, the benefit of a trained work force, and 'the advantages of a civilized society.'." *Exxon Corp.* v. *Wisconsin Dept. of Revenue,* 447 U. S. 207, 228 (1980), quoting *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S. 434, 445 (1979). See *Washington Revenue Dept.* v. *Association of Wash. Stevedoring Cos.,* 435 U. S., at 750–751; *id.,* at 764 (POWELL, J., concurring in part and concurring in result); *General Motors Corp.* v. *Washington,* 377 U. S. 436, 440–441 (1964).

Furthermore, there can be no question that Montana may constitutionally raise general revenue by imposing a 'severance tax on coal mined in the State. The entire value of the coal, before transportation, originates in the State, and mining of the coal depletes the resource base and wealth of the State, thereby diminishing a future source of taxes and economic activity.[13] Cf. *Maryland* v. *Louisiana,* 451 U. S., at 758–759. In many respects, a severance tax is like a real property tax, which has never been doubted as a legitimate means of raising revenue by the situs State (quite apart from the right of that or any other State to tax income derived from use of the property). See, *e. g., Old Dominion S.S. Co.* v. *Virginia,* 198 U. S. 299 (1905); *Western Union Telegraph Co.* v. *Missouri ex rel. Gottlieb,* 190 U. S. 412 (1903); *Postal Telegraph Cable Co.* v. *Adams,* 155 U. S. 688 (1895). When, as here, a general revenue tax does not discriminate against interstate commerce and is apportioned to activities occurring within

---

[13] Most of the States raise revenue by levying a severance tax on mineral production. The first such tax was imposed by Michigan in 1846. See U. S. Dept. of Agric., State Taxation of Mineral Deposits and Production (1977). By 1979, 33 States had adopted some type of severance tax. See U. S. Bureau of Census, State Government Tax Collections in 1979, Table 3, p. 6 (1980).

the State, the State "is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society." *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444 (1940). As we explained in *General Motors Corp.* v. *Washington, supra,* at 440–441:

> "[T]he validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation. For our purposes, the decisive issue turns on the operating incidence of the tax. In other words, the question is whether the State has exerted its power in proper proportion to appellant's activities within the State and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded. . . . As was said in *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444 (1940), '[t]he simple but controlling question is whether the state has given anything for which it can ask return.' "

The relevant inquiry under the fourth prong of the *Complete Auto Transit* test [14] is not, as appellants suggest, the *amount* of the tax or the *value* of the benefits allegedly bestowed as measured by the costs the State incurs on account of the taxpayer's activities.[15] Rather, the test is

---

[14] The fourth prong of the *Complete Auto Transit* test is derived from *General Motors, J. C. Penney,* and similar cases. See 430 U. S., at 279, n. 8; see also *National Geographic Society* v. *California Board of Equalization,* 430 U. S. 551, 558 (1977).

[15] Indeed, the words "amount" and "value" were not even used in *Complete Auto Transit.* See 430 U. S., at 279. Similarly, our cases applying the *Complete Auto Transit* test have not mentioned either of these words. See *Exxon Corp.* v. *Wisconsin Dept. of Revenue,* 447 U. S. 207, 228 (1980); *Mobil Oil Corp.* v. *Commissioner of Taxes,* 445 U. S. 425, 443 (1980); *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S.

closely connected to the first prong of the *Complete Auto Transit* test. Under this threshold test, the interstate business must have a substantial nexus with the State before *any* tax may be levied on it. See *National Bellas Hess, Inc.* v. *Illinois Revenue Dept.*, 386 U. S. 753 (1967). Beyond that threshold requirement, the fourth prong of the *Complete Auto Transit* test imposes the additional limitation that the *measure* of the tax must be reasonably related to the extent of the contact, since it is the activities or presence of the taxpayer in the State that may properly be made to bear a "just share of state tax burden," *Western Live Stock* v. *Bureau of Revenue*, 303 U. S., at 254. See *National Geographic Society* v. *California Board of Equalization*, 430 U. S. 551 (1977); *Standard Pressed Steel Co.* v. *Washington Revenue Dept.*, 419 U. S. 560 (1975). As the Court explained in *Wisconsin* v. *J. C. Penney Co., supra*, at 446 (emphasis added), "the incidence of the tax *as well as its measure* [must be] tied to the earnings which the State . . . has made possible, insofar as government is the prerequisite for the fruits of civilization for which, as Mr. Justice Holmes was fond of saying, we pay taxes."

Against this background, we have little difficulty concluding that the Montana tax satisfies the fourth prong of the *Complete Auto Transit* test. The "operating incidence" of the tax, see *General Motors Corp.* v. *Washington*, 377 U. S., at 440–441, is on the mining of coal within Montana. Because it is measured as a percentage of the value of the coal taken, the Montana tax is in "proper proportion" to appellants' activities within the State and, therefore, to their "consequent enjoyment of the opportunities and protections which the State has afforded" in connection with those activities. *Id.*, at 441. Cf. *Nippert* v. *Richmond*, 327 U. S., at 427.

---

434, 444–445 (1979); *Washington Revenue Dept.* v. *Association of Wash. Stevedoring Cos.*, 435 U. S. 734, 750 (1978); *National Geographic Society* v. *California Board of Equalization, supra*, at 558.

When a tax is assessed in proportion to a taxpayer's activities or presence in a State, the taxpayer is shouldering its fair share of supporting the State's provision of "police and fire protection, the benefit of a trained work force, and 'the advantages of a civilized society.' " *Exxon Corp.* v. *Wisconsin Dept. of Revenue,* 447 U. S., at 228, quoting *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S., at 445.

Appellants argue, however, that the fourth prong of the *Complete Auto Transit* test must be construed as requiring a factual inquiry into the relationship between the revenues generated by a tax and costs incurred on account of the taxed activity, in order to provide a mechanism for judicial disapproval under the Commerce Clause of state taxes that are excessive. This assertion reveals that appellants labor under a misconception about a court's role in cases such as this.[16] The simple fact is that the appropriate level or rate of taxation is essentially a matter for legislative, and not judicial, resolution.[17] See *Helson & Randolph* v. *Kentucky,* 279 U. S. 245, 252 (1929); cf. *Pittsburgh* v. *Alco Parking Corp.,* 417

---

[16] In any event, the linchpin of appellants' contention is the incorrect assumption that the amount of state taxes that may be levied on an activity connected to interstate commerce .is limited by the costs incurred by the State on account of that activity. Only then does it make sense to advocate judicial examination of the relationship between taxes paid and benefits provided. But as we have previously noted, see *supra,* at 623–624, interstate commerce may be required to contribute to the cost of providing *all* governmental services, including those services from which it arguably receives no direct "benefit." In such circumstances, absent an equal protection challenge (which appellants do not raise), and unless a court is to second-guess legislative decisions about the amount or disposition of tax revenues, it is difficult to see how the court is to go about comparing costs and benefits in order to decide whether the tax burden on an activity connected to interstate commerce is excessive.

[17] Of course, a taxing statute may be judicially disapproved if it is "so arbitrary as to compel the conclusion that it does not involve an exertion of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property." *Magnano Co.* v. *Hamilton,* 292 U. S. 40, 44 (1934).

U. S. 369 (1974); *Magnano Co.* v. *Hamilton,* 292 U. S. 40 (1934). In essence, appellants ask this Court to prescribe a test for the validity of state taxes that would require state and federal courts, as a matter of federal constitutional law, to calculate acceptable rates or levels of taxation of activities that are conceded to be legitimate subjects of taxation. This we decline to do.

In the first place, it is doubtful whether any legal test could adequately reflect the numerous and competing economic, geographic, demographic, social, and political considerations that must inform a decision about an acceptable rate or level of state taxation, and yet be reasonably capable of application in a wide variety of individual cases. But even apart from the difficulty of the judicial undertaking, the nature of the factfinding and judgment that would be required of the courts merely reinforces the conclusion that questions about the appropriate level of state taxes must be resolved through the political process. Under our federal system, the determination is to be made by state legislatures in the first instance and, if necessary, by Congress, when particular state taxes are thought to be contrary to federal interests.[18] Cf. *Mobil Oil Corp.* v. *Commissioner of Taxes,* 445 U. S., at 448–449; *Moorman Mfg. Co.* v. *Bair,* 437 U. S., at 280.

Furthermore, the reference in the cases to police and fire protection and other advantages of civilized society is not, as appellants suggest, a disingenuous incantation designed to avoid a more searching inquiry into the relationship between the *value* of the benefits conferred on the taxpayer and the *amount* of taxes it pays. Rather, when the measure of a tax is reasonably related to the taxpayer's activities or presence in the State—from which it derives some benefit such as the

---

[18] The controversy over the Montana tax has not escaped the attention of the Congress. Several bills were introduced during the 96th Congress to limit the rate of state severance taxes. See S. 2695, H. R. 6625, H. R. 6654 and H. R. 7163. Similar bills have been introduced in the 97th Congress. See S. 178, H. R. 1313.

substantial privilege of mining coal—the taxpayer will realize, in proper proportion to the taxes it pays, "[t]he only benefit to which the taxpayer is constitutionally entitled . . . [:] that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes." *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S., at 522. Correspondingly, when the measure of a tax bears no relationship to the taxpayers' presence or activities in a State, a court may properly conclude under the fourth prong of the *Complete Auto Transit* test that the State is imposing an undue burden on interstate commerce. See *Nippert* v. *Richmond*, 327 U. S., at 427; cf. *Michigan-Wisconsin Pipe Line Co.* v. *Calvert*, 347 U. S. 157 (1954). We are satisfied that the Montana tax, assessed under a formula that relates the tax liability to the value of appellant coal producers' activities within the State, comports with the requirements of the *Complete Auto Transit* test. We therefore turn to appellants' contention that the tax is invalid under the Supremacy Clause.

### III

#### A

Appellants contend that the Montana tax, as applied to mining of federally owned coal, is invalid under the Supremacy Clause because it "substantially frustrates" the purposes of the Mineral Lands Leasing Act of 1920, ch. 85, 41 Stat. 437, 30 U. S. C. § 181 *et seq.* (1976 ed. and Supp. III) (1920 Act), as amended by the Federal Coal Leasing Amendments Act of 1975, Pub. L. 94–377, 90 Stat. 1083 (1975 Amendments). Appellants argue that under the 1920 Act, the "economic rents" attributable to the mining of coal on federal land—*i. e.*, the difference between the cost of production (including a reasonable profit) and the market price of the coal—are to be captured by the Federal Government in the form of royalty payments from federal lessees. The payments thus

received are then to be divided between the States and the Federal Government according to a formula prescribed by the Act.[19]   In appellants' view, the Montana tax seriously undercuts and disrupts the 1920 Act's division of revenues between the Federal and State Governments by appropriating directly to Montana a major portion of the "economic rents."   Appellants contend the Montana tax will alter the statutory scheme by causing potential coal producers to reduce the amount they are willing to bid in royalties on federal leases.

As an initial matter, we note that this argument rests on a factual premise—that the principal effect of the tax is to shift a major portion of the relatively fixed "economic rents" attributable to the extraction of federally owned coal from the Federal Treasury to the State of Montana—that appears to be inconsistent with the premise of appellants' Commerce Clause claims.   In pressing their Commerce Clause arguments, appellants assert that the Montana tax increases the cost of Montana coal, thereby *increasing* the total amount of "economic rents," and that the burden of the tax is borne by out-of-state consumers, not the Federal Treasury.[20]   But

---

[19] As originally enacted in 1920, § 35 of the Mineral Lands Leasing Act, ch. 85, 41 Stat. 450, 30 U. S. C. § 191 (1970 ed.), provided that all receipts from the leasing of public lands under the Act were to be paid into the United States Treasury and then divided as follows: 37.5% to the State in which the leased lands are located; 52.5% to the reclamation fund created by the Reclamation Act of 1902, ch. 1093, § 1, 32 Stat. 388, 43 U. S. C. § 391; and the remaining 10% to be deposited in the Treasury under "miscellaneous receipts."

Section 35 was amended by § 9 (a) of the 1975 Amendments to provide for a new statutory formula which is currently in effect.   Under this formula, the State in which the mining occurs receives 50% of the revenues, the reclamation fund receives 40%, and the United States Treasury the remaining 10%.   30 U. S. C. § 191.

[20] Indeed, appellants alleged in their complaints that the contracts between appellant coal producers and appellant utility companies *require* the utility companies to reimburse the coal producers for their severance tax payments, and that the ultimate incidence of the tax primarily falls

even assuming that the Montana tax may reduce royalty payments to the Federal Government under leases executed in Montana, this fact alone hardly demonstrates that the tax is inconsistent with the 1920 Act. Indeed, appellants' argument is substantially undermined by the fact that in § 32 of the 1920 Act, 41 Stat. 450, 30 U. S. C. § 189, Congress expressly authorized the States to impose severance taxes on federal lessees without imposing any limits on the amount of such taxes. Section 32, as set forth in 30 U. S. C. § 189, provides in pertinent part:

> "Nothing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have, including the right to levy and collect taxes upon improvements, output of mines, or other rights, property, or assets of any lessee of the United States."

This Court had occasion to construe § 32 soon after it was enacted. The Court explained:

> "Congress . . . meant by the proviso to say in effect that, although the act deals with the letting of public lands and the relations of the [federal] government to the lessees thereof, nothing in it shall be so construed as to affect the right of the states, in respect of such private persons and corporations, to *levy and collect taxes as though the government were not concerned.* . . .
>
> .  .        .         .         .         .
>
> "We think the proviso plainly discloses the intention of Congress that *persons and corporations contracting with the United States under the act, should not, for that reason, be exempt from any form of state taxation other-*

---

on the utilities' out-of-state customers. Complaint ¶¶ 17, 18, App. to Juris. Statement (J. S. App.) 53a–54a. Presumably, with regard to these contracts, the Federal Government's receipts will be unaffected by the Montana tax.

*wise lawful.*" *Mid-Northern Oil Co.* v. *Walker,* 268 U. S. 45, 48–50 (1925) (emphasis added).

It necessarily follows that if the Montana tax is "otherwise lawful," the 1920 Act does not forbid it.

Appellants contend that the Montana tax is not "otherwise lawful" because it conflicts with the very purpose of the 1920 Act. We do not agree. There is nothing in the language or legislative history of either the 1920 Act or the 1975 Amendments to support appellants' assertion that Congress intended to maximize and capture *all* "economic rents" from the mining of federal coal, and then to distribute the proceeds in accordance with the statutory formula. The House Report on the 1975 Amendments, for example, speaks only in terms of a congressional intent to secure a "fair return to the public." H. R. Rep. No. 94–681, pp. 17–18 (1975). Moreover, appellants' argument proves too much. By definition, any state taxation of federal lessees reduces the "economic rents" accruing to the Federal Government, and appellants' argument would preclude any such taxes despite the explicit grant of taxing authority to the States by § 32. Finally, appellants' contention necessarily depends on inferences to be drawn from §§ 7 and 35 of the 1920 Act, 30 U. S. C. §§ 207 and 191, which, as amended, prescribe the statutory formula for the division of the payments received by the Federal Government. See Complaint ¶¶ 38–41, J. S. App. 57a–58a. Yet § 32 of the 1920 Act, as set forth in 30 U. S. C. § 189, states that "[n]othing in this chapter"—which includes §§ 7 and 35—"shall be construed or held to affect the rights of the States . . . to levy and collect taxes upon . . . output of mines . . . of any lessee of the United States." And if, as the Court has held, the States may "levy and collect taxes as though the [federal] government were not concerned," *Mid-Northern Oil Co.* v. *Walker, supra,* at 49, the manner in which the Federal Government collects receipts from its lessees and then shares them with the States has no bearing on the validity of a state tax. We

therefore reject appellants' contention that the Montana tax must be invalidated as inconsistent with the Mineral Lands Leasing Act.

## B

The final issue we must consider is appellants' assertion that the Montana tax is unconstitutional because it substantially frustrates national energy policies, reflected in several federal statutes, encouraging the production and use of coal, particularly low-sulfur coal such as is found in Montana. Appellants insist that they are entitled to a hearing to explore the contours of these national policies and to adduce evidence supporting their claim that the Montana tax substantially frustrates and impairs the policies.

We cannot quarrel with appellants' recitation of federal statutes encouraging the use of coal. Appellants correctly note that § 2 (6) of the Energy Policy and Conservation Act of 1975, 89 Stat. 874, 42 U. S. C. § 6201 (6), declares that one of the Act's purposes is "to reduce the demand for petroleum products and natural gas through programs designed to provide greater availability and use of this Nation's abundant coal resources." And § 102 (b)(3) of the Powerplant and Industrial Fuel Use Act of 1978 (PIFUA), 92 Stat. 3291, 42 U. S. C. § 8301 (b)(3) (1976 ed., Supp. III), recites a similar objective "to encourage and foster the greater use of coal and other alternate fuels, in lieu of natural gas and petroleum, as a primary energy source." We do not, however, accept appellants' implicit suggestion that these general statements demonstrate a congressional intent to pre-empt all state legislation that may have an adverse impact on the use of coal. In *Exxon Corp.* v. *Governor of Maryland,* 437 U. S. 117 (1978), we rejected a pre-emption argument similar to the one appellants urge here. There, it was argued that the "basic national policy favoring free competition" reflected in the Sherman Act pre-empted a state law regulating retail distribution of gasoline. *Id.,* at 133. The Court acknowledged

the conflict between the state law and this national policy, but rejected the suggestion that the "broad implications" of the Sherman Act should be construed as a congressional decision to pre-empt the state law. *Id.*, at 133–134. Cf. *New Motor Vehicle Bd. of California* v. *Orrin W. Fox Co.*, 439 U. S. 96, 110–111 (1978). As we have frequently indicated, "[p]re-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.'" *Chicago & North Western Transp. Co.* v. *Kalo Brick & Tile Co.*, 450 U. S. 311, 317 (1981), quoting *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142 (1963). See *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504, 522 (1981); *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525–526 (1977); *Perez* v. *Campbell*, 402 U. S. 637, 649 (1971). In cases such as this, it is necessary to look beyond general expressions of "national policy" to specific federal statutes with which the state law is claimed to conflict.[21] The only specific statutory provisions favoring the use of coal cited by appellants are those in PIFUA.

PIFUA prohibits new electric power plants or new major fuel-burning installations from using natural gas or petroleum as a primary energy source, and prohibits existing facilities from using natural gas as a primary energy source after 1989. 42 U. S. C. §§ 8311 (1), 8312 (a) (1976 ed., Supp. III). Appellants contend that "the manifest purpose of this Act to favor the use of coal is clear." Brief for Appellants 37. As the statute itself makes clear, however, Congress did not intend PIFUA to pre-empt state severance taxes on coal. Section 601 (a)(1) of PIFUA, 92 Stat. 3323, 42 U. S. C. § 8401 (a)(1) (1976 ed., Supp. III), provides for federal fi-

---

[21] Thus, in *Exxon*, after rejecting the "national policy" pre-emption argument, the Court went on to consider more focused allegations concerning alleged conflicts between the state law and specific provisions of the Robinson-Patman Act. 437 U. S., at 129–133.

nancial assistance to areas of a State adversely affected by increased coal or uranium mining, based upon findings by the Governor of the State that the state or local government lacks the financial resources to meet increased demand for housing or public services and facilities in such areas. Section 601 (a)(2), 42 U. S. C. § 8401 (a)(2) (1976 ed., Supp. III), then provides that

> "increased revenues, *including severance tax revenues,* royalties, and similar fees to the State and local governments which are associated with the increase in coal or uranium development activities . . . shall be taken into account in determining if a State or local government lacks financial resources."

This section clearly contemplates the continued existence, not the pre-emption, of state severance taxes on coal and other minerals.

Furthermore, the legislative history of § 601 (a)(2) reveals that Congress enacted this provision with Montana's tax specifically in mind. The Senate version of the PIFUA bill provided for impact aid, but the House bill did not. See H. R. Conf. Rep. No. 95–1749, p. 93 (1978). The Senate's proposal for impact aid was opposed by the House conferees, who took the position that the States would be able to satisfy the demand for additional facilities and services caused by increased coal production through imposition of severance taxes and, in Western States, through royalties received under the Mineral Lands Leasing Act. See Transcript of the Joint Conference on Energy 1822, 1824, 1832, 1834–1837, 1839 (1977) (Tr.), reprinted in 2 U. S. Dept. of Energy, Legislative History: Powerplant and Industrial Fuel Use Act, 777, 779, 787, 789–792, 794 (1978) (Legislative History). In explaining the objections of the House conferees, Representative Eckhardt pointed out:

> "[T]he western states may collect severance taxes on that coal.

"As I pointed out [see Tr. 1822, Legislative History, at 777], Montana already collects $3 a ton on severance taxes on coal and still enjoys a 50 percent royalty return. As the price of coal goes up . . . these severance taxes in addition go up.

"This is a percentage tax, not a flat tax in most instances.

"If we are going to merely determine on the basis of impact on a particular community in a state how much money is going to go to that community, without taking into account how much that community is enriched, I think we are going to have people who are so angry at us in Congress . . . ." Tr. 1835, Legislative History, at 790.

Section 601 (a)(2) was obviously included in PIFUA as a response to these concerns, for it provides that severance taxes and royalties are to be "taken into account" in determining eligibility for impact aid. The legislative history of § 601 (a)(2) thus confirms what seems evident from the face of the statute—that Montana's severance tax is not preempted by PIFUA. Since PIFUA is the only federal statute that even comes close to providing a specific basis for appellants' claims that the Montana statute "substantially frustrates" federal energy policies, this aspect of appellants' Supremacy Clause argument must also fail.[22]

## IV

In sum, we conclude that appellants have failed to demonstrate either that the Montana tax suffers from any of the constitutional defects alleged in their complaints, or that a

---

[22] Appellants' assertion that the Montana tax is pre-empted by the Clean Air Act, 42 U. S. C. § 7401 et seq. (1976 ed., Supp. III), merits little discussion. The Clean Air Act does not mandate the use of coal; it merely prescribes standards governing the emission of sulfur dioxide when coal is used. Any effect those standards might have on the use of high or low sulphur coal is incidental.

trial is necessary to resolve the issue of the constitutionality of the tax. Consequently, the judgment of the Supreme Court of Montana is affirmed.

*So ordered.*

JUSTICE WHITE, concurring.

This is a very troublesome case for me, and I join the Court's opinion with considerable doubt and with the realization that Montana's levy on consumers in other States may in the long run prove to be an intolerable and unacceptable burden on commerce. Indeed, there is particular force in the argument that the tax is here and now unconstitutional. Montana collects most of its tax from coal lands owned by the Federal Government and hence by all of the people of this country, while at the same time sharing equally and directly with the Federal Government all of the royalties reserved under the leases the United States has negotiated on its land in the State of Montana. This share is intended to compensate the State for the burdens that coal mining may impose upon it. Also, as JUSTICE BLACKMUN cogently points out, *post,* at 643, n. 9, another 40% of the federal revenue from mineral leases is indirectly returned to the States through a reclamation fund. In addition, there is statutory provision for federal grants to areas affected by increased coal production.

But this very fact gives me pause and counsels withholding our hand, at least for now. Congress has the power to protect interstate commerce from intolerable or even undesirable burdens. It is also very much aware of the Nation's energy needs, of the Montana tax, and of the trend in the energy-rich States to aggrandize their position and perhaps lessen the tax burdens on their own citizens by imposing unusually high taxes on mineral extraction. Yet, Congress is so far content to let the matter rest, and we are counseled by the Executive Branch through the Solicitor General not to overturn the Montana tax as inconsistent with either the Commerce Clause

or federal statutory policy in the field of energy or otherwise. The constitutional authority and the machinery to thwart efforts such as those of Montana, if thought unacceptable, are available to Congress, and surely Montana and other similarly situated States do not have the political power to impose their will on the rest of the country. As I presently see it, therefore, the better part of both wisdom and valor is to respect the judgment of the other branches of the Government. I join the opinion and the judgment of the Court.

JUSTICE BLACKMUN, with whom JUSTICE POWELL and JUSTICE STEVENS join, dissenting.

In *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274 (1977), a unanimous Court observed: "A tailored tax, however accomplished, must receive the careful scrutiny of the courts to determine whether it produces a forbidden effect on interstate commerce." *Id.,* at 288–289, n. 15. In this case, appellants have alleged that Montana's severance tax on coal is tailored to single out interstate commerce, and that it produces a forbidden effect on that commerce because the tax bears no "relationship to the services provided by the State." *Ibid.* The Court today concludes that appellants are not entitled to a *trial* on this claim. Because I believe that the "careful scrutiny" due a tailored tax makes a trial here necessary, I respectfully dissent.

## I

The State of Montana has approximately 25% of all known United States coal reserves, and more than 50% of the Nation's low-sulfur coal reserves.[1] Department of Energy, Demonstrated Reserve Base of Coal in the United States on January 1, 1979, p. 8 (1981); National Coal Assn., Coal Data 1978, p. I–6 (1980). Approximately 70–75% of Montana's

---

[1] Montana and Wyoming together contain 40% of all United States coal reserves and 68% of all reserves of low-sulfur coal. H. R. Rep. No. 96–1527, pt. 1, p. 3 (1980).

coal lies under land owned by the Federal Government in the State. See Hearings on H. R. 6625, H. R. 6654, and H. R. 7163 before the Subcommittee on Energy and Power of the House Committee on Interstate and Foreign Commerce, 96th Cong., 2d Sess., 22 (1980) (Hearings) (statement of Rep. Vento). The great bulk of the coal mined in Montana—indeed, allegedly as much as 90%, see *ante,* at 617–618—is exported to other States pursuant to long-term purchase contracts with out-of-state utilities. See H. R. Rep. No. 96–1527, pt. 1, pp. 3–4 (1980). Those contracts typically provide that the costs of state taxation shall be passed on to the utilities; in turn, fuel adjustment clauses allow the utilities to pass the cost of taxation along to their consumers. *Ibid.* Because federal environmental legislation has increased the demand for low-sulfur coal, *id.,* at 3, and because the Montana coal fields occupy a "pivotal" geographic position in the midwestern and northwestern energy markets, see J. Krutilla & A. Fisher with R. Rice, Economic and Fiscal Impacts of Coal Development: Northern Great Plains xvi (1978) (Krutilla), Montana has supplied an increasing percentage of the Nation's coal.[2]

In 1975, following the Arab oil embargo and the first federal coal conversion legislation, the Montana Legislature, by 1975 Mont. Laws, ch. 525, increased the State's severance tax on coal from a flat rate of approximately 34 cents per ton to a maximum rate of 30% of the "contract sales price." Mont. Code Ann. § 15–35–103 (1979).[3] See H. R. Rep. No. 96–1527, pt. 1, p. 3 (1980). The legislative history of this tax is illuminating. The Joint Conference Committees of the Mon-

---

[2] Together with Wyoming, Montana supplied 10% of the United States' demand for coal in 1977; it is estimated that Montana and Wyoming will supply 33% of the Nation's coal by 1990. Hearings 22 (statement of Rep. Vento).

[3] The pre-1975 rate was 12, 22, 34, or 40 cents per ton depending on the Btu content of the coal mined. Krutilla, at 50. Appellants state that coal taxed at 34 cents per ton prior to the 1975 amendment is now typically taxed at the effective rate of $2.08 per ton. Brief for Appellants 7–8.

tana Legislature that recommended this amendment acknowl-
edged: "It is true that this is a higher rate of taxation than
that levied by any other American state on the coal indus-
try." [4] Statement to Accompany the Report of the Free
Joint Conference Committees on Coal Taxation 1 (1975).
The Committees pointed out, however, that the Province of
Alberta, Canada, recently had raised sharply its royalty on
natural gas, thereby forcing consumers of Alberta gas in
Montana and elsewhere to finance involuntarily Alberta's
"universities, hospitals, reduction of other taxes, etc." *Ibid.*
Stating that "we should . . . look north to Alberta," the Con-
ference Committees observed: "While coal is not as scarce
as natural gas, most of the Montana coal now produced is
committed for sale under long-term contracts and will be
purchased with this tax added to its price." *Ibid.* The
Committees noted that although some new coal contracts
might shift to Wyoming to take advantage of that State's
lower severance tax, Montana's severance tax was comparable
to that recently enacted by North Dakota.[5] Thus, the Com-

---

[4] In fact, the study of coal production taxes commissioned by the
Montana Legislature in 1974, see *ante,* at 612–613, found that while other
States may have imposed a higher overall tax burden on coal, "no coal state
had, through 1973, higher severance and property taxes than Montana."
Subcommittee on Fossil Fuel Taxation, Interim Study on Fossil Fuel Tax-
ation 14 (1974). Thus, even prior to the 1975 amendment, "Montana
and its local governments tax[ed] the *production* of fossil fuels at a higher
level than any competitive state . . . ." (Emphasis in original.) *Ibid.*

[5] North Dakota taxes lignite at a flat rate that is estimated to equal
about 20% of value. See H. R. Rep. No. 96–1527, pt. 1, p. 3 (1980).
Apparently inspired by these examples, Wyoming increased its state
severance and local ad valorem taxes to a combined total of approximately
17½% of value. Wyo. Stat. Ann. §§ 39–2–202, 39–2–402, 39–6–302 (a)–
(f), and 39–6–303 (a) (1977 and Supp. 1980). See H. R. Rep. No. 96–
1527, pt. 1, p. 3 (1980). With the possible exception of North Dakota's
tax on lignite, the severance taxes imposed by Montana and Wyoming are
higher than the taxes imposed on energy reserves by any other State.
*Ibid.*

Significantly, however, other Western States have considered or are con-
sidering raising their taxes on coal production. *Ibid.* One study con-

mittees had no doubt that the coal industry would grow even with this tax, since "the combined coal reserves of Montana and North Dakota are simply too great a part of the nation's fossil fuel resources to be ignored because of taxes at these levels." [6] *Ibid.*

As the Montana Legislature foresaw, the imposition of this severance tax has generated enormous revenues for the State. Montana collected $33.6 million in severance taxes in fiscal year 1978, H. R. Rep. No. 96–1527, pt. 1, p. 3 (1980), and appellants alleged that it would collect not less than $40 million in fiscal year 1979. App. to Juris. Statement 55a. It has been suggested that by the year 2010, Montana will have collected more than $20 billion through the implementation of this tax. Hearings 22 (statement of Rep. Vento).

---

cluded that " '[t]ax leadership' in the western states appears to be an emerging reality," and that informal cartel arrangements may arise among these States. Church, Conflicting Federal, State and Local Interest Trends in State and Local Energy Taxation: Coal and Copper—A Case in Point, 31 Nat. Tax J. 269, 278 (1978) (Church). Indeed, the 1974 Montana Subcommittee on Fossil Fuel Taxation, see n. 4, *supra*, was directed by the Montana Legislature "to investigate the feasibility and value of multi-state taxation of coal with the Dakotas and Wyoming, and to contract and cooperate joining with these other states to achieve that end . . . ." House Resolution No. 45, 1974 Mont. Laws, p. 1620. The Subcommittee recommended that the Executive pursue this goal. Subcommittee on Fossil Fuel Taxation, *supra*, at 2.

[6] One of the principal sponsors of the severance tax bill explained to the Montana Legislature:

"Most of Montana's coal is shipped out of state to power plants and utility companies in the Midwest. In reviewing the [long-term] contracts between the coal companies and the utility companies who purchase the coal, all of the contracts that were shown to our Legislative Committee contain an escalation clause for taxes. In other words, the local companies simply add the additional taxes to their bill, and the entire cost is passed on to the purchasers in the Midwest or elsewhere. Because most of the purchasers are regulated utility companies, it is reasonable to assume these companies will, in turn, pass on their extra costs to their customers." Towe, Explanation of Reasons for Montana's Coal Tax 4, cited in Brief for Appellants 34.

No less remarkable is the increasing percentage of total revenue represented by the severance tax. In 1972, the then-current flat rate severance tax on coal provided only 0.4% of Montana's total tax revenue; in contrast, in the year following the 1975 amendment, the coal severance tax supplied 11.4% of the State's total tax revenue. See Griffin & Shelton, Coal Severance Tax Policies in the Rocky Mountain States, 7 Policy Studies J. 29, 33 (1978) (Griffin). Appellants assert that the tax now supplies almost 20% of the State's total revenue. Tr. of Oral Arg. 31. Indeed, the funds generated by the tax have been so large that, beginning in 1980, at least 50% of the severance tax is to be transferred and dedicated to a permanent trust fund, the principal of which must "forever remain inviolate" unless appropriated by a vote of three-fourths of the members of each house of the legislature. Mont. Const., Art. IX, § 5. Moreover, in 1979, Montana passed legislation providing property and income tax relief for state residents. 1979 Mont. Laws, ch. 698.

Appellants' complaint alleged that Montana's severance tax is ultimately borne by out-of-state consumers, and for the purposes of this appeal that allegation is to be treated as true.[7] Appellants further alleged that the tax bears no reasonable relationship to the services or protection provided by the State. The issue here, of course, is whether they are entitled to a trial on that claim, not whether they will succeed on the merits. It should be noted, however, that Montana imposes numerous other taxes upon coal mining.[8] In addi-

---

[7] The Montana Supreme Court observed that under Montana law, facts well pleaded in the complaint must be accepted as true on review of a judgment of dismissal; it therefore necessarily held that appellants could not prevail "under any view of the alleged facts." — Mont. —, —, 615 P. 2d 847, 849 (1980). See also Tr. of Oral Arg. 17–18.

[8] In addition to the severance tax on coal, Montana imposes a gross proceeds tax, Mont. Code Ann. § 15–6–132 (1979), a resource indemnity trust tax, § 15–38–104, a property tax on mining equipment, § 15–6–138

tion, because 70% to 75% of the coal-bearing land in Montana is owned by the Federal Government, Montana derives a large amount of coal mining revenue from the United States as well.[9] In light of these circumstances, the Interstate and Foreign Commerce Committee of the United States House of Representatives concluded that Montana's coal severance tax results in revenues "far in excess of the direct and indirect impact costs attributable to the coal production." H. R. Rep. No. 96–1527, pt. 1, p. 2 (1980). Several commentators have agreed that Montana and other similarly situated Western States have pursued a policy of "OPEC-like revenue maximization," and that the Montana tax accordingly bears no reasonable relationship to the services and protection afforded by the State. R. Nehring & B. Zycher with J. Wharton, Coal Development and Government Regulation in the Northern Great Plains: A Preliminary Report 148 (1976); Church, at 272. See Krutilla, at 185. These findings, of course, are not dispositive of the issue whether the Montana severance tax is "fairly related" to the services

---

(b), and a corporation license tax, § 15–31–101. See Krutilla, at 50–54. Furthermore, all costs of reclamation must be borne by the coal companies under both federal and state law, and Montana requires each company to purchase a reclamation bond prior to the commencement of mining operations. § 82–4–338.

[9] By federal statute, 50% of the "sales, bonuses, royalties, and rentals" of federal public lands are payable to the State within which the leased land lies "to be used by such State and its subdivisions, as the legislature of the State may direct giving priority to those subdivisions of the State socially or economically impacted by development of minerals leased under this chapter, for (i) planning, (ii) construction and maintenance of public facilities, and (iii) provision of public service . . . ." Mineral Lands Leasing Act of 1920, § 35, 41 Stat. 450, as amended, 30 U. S. C. § 191. An additional 40% of this federal revenue from mineral leases is indirectly returned to the States through a reclamation fund. *Ibid.* Moreover, § 601 of the Powerplant and Industrial Fuel Use Act of 1978, Pub. L. 95–620, 92 Stat. 3323, 42 U. S. C. § 8401 (1976 ed., Supp. III), authorizes federal grants to areas affected by increased coal production.

provided by the State within the meaning of our prior cases. They do suggest, however, that appellants' claim is a substantial one. The failure of the Court to acknowledge this stems, it seems to me, from a misreading of our prior cases. It is to those cases that I now turn.

## II

This Court's Commerce Clause cases have been marked by tension between two competing concepts: the view that interstate commerce should enjoy a "free trade" immunity from state taxation, see, *e. g., Freeman* v. *Hewit,* 329 U. S. 249, 252 (1946), and the view that interstate commerce may be required to "'pay its way,'" see, *e. g., Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 254 (1938). See generally *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S., at 278–281, 288–289, n. 15; Simet & Lynn, Interstate Commerce Must Pay Its Way: The Demise of Spector, 31 Nat. Tax J. 53 (1978); Hellerstein, Foreword, State Taxation Under the Commerce Clause: An Historical Perspective, 29 Vand. L. Rev. 335, 335–339 (1976). In *Complete Auto Transit,* the Court resolved that tension by unanimously reaffirming that interstate commerce is not immune from state taxation. 430 U. S., at 288. But at the same time the Court made clear that not all state taxation of interstate commerce is valid; a state tax will be sustained against Commerce Clause challenge *only* if "the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Id.,* at 279. See *Maryland* v. *Louisiana,* 451 U. S. 725, 754 (1981).

The Court today acknowledges and, indeed, holds that a Commerce Clause challenge to a state severance tax must be evaluated under *Complete Auto Transit's* four-part test. *Ante,* at 617. I fully agree. I cannot agree, however, with the Court's application of that test to the facts of the present case. Appellants concede, and the Court properly concludes,

that the first two prongs of the test—substantial nexus and fair apportionment—are satisfied here. The Court also correctly observes that Montana's severance tax is facially neutral. It does not automatically follow, however, that the Montana severance tax does not unduly burden or interfere with interstate commerce. The gravamen of appellants' complaint is that the severance tax does not satisfy the fourth prong of the *Complete Auto Transit* test because it is tailored to, and does, force interstate commerce to pay *more* than its way. Under our established precedents, appellants are entitled to a trial on this claim.

The Court's conclusion to the contrary rests on the premise that the relevant inquiry under the fourth prong of the *Complete Auto Transit* test is simply whether the *measure* of the tax is fixed as a percentage of the value of the coal taken. *Ante,* at 626. This interpretation emasculates the fourth prong. No trial will ever be necessary on the issue of fair relationship so long as a State is careful to impose a proportional rather than a flat tax rate; thus, the Court's rule is no less "mechanical" than the approach entertained in *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245 (1922), disapproved today, *ante,* at 617.[10] Under the Court's reasoning, any ad valorem tax will satisfy the fourth prong; indeed, the Court implicitly ratifies Montana's contention that it is free to tax this coal at 100% or even 1,000% of value, should it

[10] This is a marked departure from the Court's prior cases. Rather than suggesting such a mechanical test, those cases imply that a tax will be struck down under the fourth prong of the *Complete Auto Transit* test if the plaintiff establishes a factual record that the tax is not fairly related to the services and protection provided by the State. See, *e. g., Washington Revenue Dept.* v. *Association of Wash. Stevedoring Cos.,* 435 U. S. 734, 750–751 (1978); *id.,* at 764 (POWELL, J., concurring in part and concurring in result). See *Merrion* v. *Jicarilla Apache Tribe,* 617 F. 2d 537, 545, n. 4 (CA10) (en banc), cert. granted, 449 U. S. 820 (1980). Even the trial court in the present case recognized that if it reached this question it "would necessarily have to deny the motion to dismiss and proceed to a factual determination." App. 37a.

choose to do so. Tr. of Oral Arg. 21. Likewise, the Court's analysis indicates that Montana's severance tax would not run afoul of the Commerce Clause even if it raised sufficient revenue to allow Montana to eliminate all other taxes upon its citizens.[11]

The Court's prior cases neither require nor support such a startling result.[12] The Court often has noted that " '[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their *just share* of state tax burden even though it increases the cost of doing the business.' " *Complete Auto Transit,* 430 U. S., at 279 (emphasis added), quoting *Western Live Stock,* 303 U. S., at 254. See *Maryland* v. *Louisiana,* 451 U. S., at 754. Accordingly,

---

[11] As the example of Alaska illustrates, this prospect is not a fanciful one. Ninety percent of Alaska's revenue derives from petroleum taxes and royalties; because of the massive sums that have been so raised, that State's income tax has been eliminated. See N. Y. Times, June 5, 1981, section 1, p. A10, col. 1. As noted above, Montana's severance tax already allegedly accounts for 20% of its total tax revenue, and the State has enacted property and income tax relief.

[12] The Court apparently derives its interpretation of the fourth prong of the *Complete Auto Transit* test primarily from *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435 (1940), and *General Motors Corp.* v. *Washington,* 377 U. S. 436 (1964). *Ante,* at 624–626. In neither of those cases, however, did the Court consider the question presented here. *J. C. Penney* involved a *Fourteenth Amendment* challenge brought by a foreign corporation to a Wisconsin tax imposed on domestic and foreign corporations "for the privilege of declaring . . . dividends" out of income from property located and business transacted in Wisconsin. The corporation argued that because the income from the Wisconsin transactions had been transferred to New York, Wisconsin had "no jurisdiction to tax" those amounts. 311 U. S., at 436. The Court rejected that argument, holding that "[t]he fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction." *Id.,* at 445. In *General Motors,* the question before the Court was the validity of an unapportioned tax on the gross receipts of a corporation in interstate commerce. The Court concluded that there was a sufficient nexus to uphold the tax. 377 U. S., at 448. See *id.,* at 449–450 (BRENNAN, J., dissenting).

interstate commerce cannot claim any exemption from a state tax that "is fairly related to the services provided by the State." *Complete Auto Transit,* 430 U. S., at 279. We have not interpreted this requirement of "fair relation" in a narrow sense; interstate commerce may be required to share equally with intrastate commerce the cost of providing "police and fire protection, the benefit of a trained work force, and 'the advantages of a civilized society.'" *Exxon Corp.* v. *Wisconsin Dept. of Revenue,* 447 U. S. 207, 228 (1980), quoting *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S. 434, 445 (1979). See, *e. g., Nippert* v. *Richmond,* 327 U. S. 416, 433 (1946). Moreover, interstate commerce can be required to "pay its own way" in a narrower sense as well: the State may tax interstate commerce for the purpose of recovering those costs attributable to the activity itself. See, *e. g., Postal Telegraph-Cable Co.* v. *Richmond,* 249 U. S. 252 (1919).[13]

---

[13] In *Postal Telegraph-Cable Co.,* a telegraph company engaged in interstate commerce challenged both an annual license tax and an annual tax of $2 for each telegraph pole that the company maintained in the city of Richmond, Va. The Court sustained the validity of the license tax on the ground that it was simply a nondiscriminatory "exercise of the police power . . . for revenue purposes." 249 U. S., at 257. In contrast, the pole tax was subjected to stricter scrutiny; the Court stated that while interstate commerce must pay its way, the authority remains in the courts, "on proper application, to determine whether, under the conditions prevailing in a given case, the charge made is reasonably proportionate to the service to be rendered and the liabilities involved, or whether it is a disguised attempt to impose a burden on interstate commerce." *Id.,* at 260.

The Court has continued to scrutinize carefully taxes on interstate commerce that are designed to reimburse the State for the particular costs imposed by that commerce. See, *e. g., Evansville-Vanderburgh Airport Authority Dist.* v. *Delta Airlines, Inc.,* 405 U. S. 707 (1972); *Clark* v. *Paul Gray, Inc.,* 306 U. S. 583 (1939); *Ingels* v. *Morf,* 300 U. S. 290 (1937). In analyzing such taxes, it has required that there be factual evidence in the record that "the fees charged do not appear to be manifestly disproportionate to the services rendered." *Clark,* 306 U. S., at 599. The Court concludes that this test has no bearing here because the Montana Supreme Court held that the coal severance tax was "'imposed for the

The Court has never suggested, however, that interstate commerce may be required to pay *more* than its own way. The Court today fails to recognize that the Commerce Clause does impose limits upon the State's power to impose even facially neutral and properly apportioned taxes. See *ante*, at 622–623. In *Michigan-Wisconsin Pipe Line Co.* v. *Calvert*, 347 U. S. 157, 163 (1954), Texas argued that no inquiry into the constitutionality of a facially neutral tax on the "taking" of gas was necessary because the State "has afforded great benefits and protection to pipeline companies." The *Calvert* Court rejected this argument, holding that "these benefits are relevant here only to show that the essential requirements of due process have been met sufficiently to justify the imposition of *any* tax on the interstate activity." *Id.*, at 163–164. The Court held, *id.*, at 164, that when a tax is challenged on Commerce Clause grounds its validity " 'depends upon other considerations of constitutional policy having reference to the substantial effects, actual or potential, of the particular tax in suppressing or burdening unduly the commerce,' " quoting *Nippert* v. *Richmond*, 327 U. S., at 424. Accordingly, while

---

general support of the government.' " *Ante*, at 621. In fact, however, the matter is not nearly so clear as the Court suggests. The Montana court also implied that the tax was designed at least in part to compensate the State for the special costs attributable to coal mining, —— Mont., at ——, ——, 615 P. 2d, at 850, 855, as have appellees here. Brief for Appellees 1–3, 26–27.

Indeed, the stated objectives of the 1975 amendment were to: "(a) preserve or modestly increase revenues going to the general fund, (b) to respond to current social impacts attributable to coal development, and (c) to invest in the future, when new energy technologies reduce our dependence on coal and mining activity may decline." Statement to Accompany the Report of the Free Joint Conference Committees on Coal Taxation 1 (1975). Since the tax was designed only to "preserve or modestly increase" general revenues, it is appropriate for a court to inquire here whether the "surplus" revenue Montana has received from this severance tax is "manifestly disproportionate" to the present or future costs attributable to coal development.

the Commerce Clause does not require that interstate commerce be placed in a privileged position, it does require that it not be unduly burdened. In framing its taxing measures to reach interstate commerce, the State must be "at pains to do so in a manner which avoids the evils forbidden by the commerce clause and puts that commerce *actually* on a plane of equality with local trade in local taxation." *Nippert,* 327 U. S., at 434 (emphasis added).

Thus, the Court has been particularly vigilant to review taxes that "single out interstate business," since "[a]ny tailored tax of this sort creates an increased danger of error in apportionment, of discrimination against interstate commerce, and of a lack of relationship to the services provided by the State." *Complete Auto Transit,* 430 U. S., at 288–289, n. 15.[14] Moreover, the Court's vigilance has not been limited to taxes that discriminate upon their face: "Not the tax in a vacuum of words, but its practical consequences for the doing of interstate commerce in applications to concrete facts are our concern." *Nippert,* 327 U. S., at 431. See *Maryland* v. *Louisiana,* 451 U. S., at 756. This is particularly true when the challenged tax, while facially neutral, falls so heavily upon interstate commerce that its burden "is not likely to be alleviated by those political restraints which are normally exerted on legislation where it affects adversely interests within the state." *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33, 46, n. 2 (1940). Cf. *Raymond Motor Transportation, Inc.* v. *Rice,* 434 U. S. 429, 446–447 (1978). In sum, then, when a tax has been "tailored" to reach interstate com-

---

[14] *Complete Auto Transit* gave several examples of "tailored" taxes: property taxes designed to differentiate between property used in transportation and other types of property; an income tax using different rates for different types of business; and a tax on the "privilege of doing business in corporate form" that changed with the nature of the corporate activity involved. 430 U. S., at 288, n. 15. A severance tax using different rates for different minerals is, of course, directly analogous to these examples.

merce, the Court's cases suggest that we require a closer "fit" under the fourth prong of the *Complete Auto Transit* test than when interstate commerce has not been singled out by the challenged tax.

As a number of commentators have noted, state severance taxes upon minerals are particularly susceptible to "tailoring." "Like a tollgate lying athwart a trade route, a severance or processing tax conditions access to natural resources." Developments in the Law: Federal Limitations on State Taxation of Interstate Business, 75 Harv. L. Rev. 953, 970 (1962). Thus, to the extent that the taxing jurisdiction approaches a monopoly position in the mineral, and consumption is largely outside the State, such taxes are "[e]conomically and politically analogous to transportation taxes exploiting geographical position." Brown, The Open Economy: Justice Frankfurter and the Position of the Judiciary, 67 Yale L. J. 219, 232 (1957) (Brown). See also Hellerstein, Constitutional Constraints on State and Local Taxation of Energy Resources, 31 Nat. Tax J. 245, 249-250 (1978); R. Posner, Economic Analysis of Law 510-514 (2d ed. 1977) (Posner). But just as a port State may require that imports pay their own way even though the tax levied increases the cost of goods purchased by inland customers, see *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276, 288 (1976),[15] so also may a mineral-rich State require that those who consume its resources pay a fair share of the general costs of government, as well as the specific costs attributable to the commerce itself. Thus, the mere fact that the burden of a severance tax is largely shifted forward to out-of-state consumers does not, standing alone, make out a Commerce Clause violation. See Hellerstein, *supra,* at 249. But the Clause *is* violated when, as appellants allege is the case here, the State effectively selects "a class of out-of-state

---

[15] See also *Washington Revenue Dept.* v. *Association of Wash. Stevedoring Cos.,* 435 U. S. 734, 754-755 (1978); *id.,* at 764 (POWELL, J., concurring in part and concurring in result).

taxpayers to shoulder a tax burden grossly in excess of any costs imposed directly or indirectly by such taxpayers on the State." *Ibid.*

### III

It is true that a trial in this case would require "complex factual inquiries" into whether economic conditions are such that Montana is in fact able to export the burden of its severance tax, *ante,* at 619, n. 8.[16]   I do not believe, however, that this threshold inquiry is beyond judicial competence.[17]   If the trial court were to determine that the tax is exported, it would then have to determine whether the tax is "fairly related," within the meaning of *Complete Auto Transit.*   The Court to the contrary, this would not require the trial court "to second-guess legislative decisions about the amount or disposition of tax revenues."   *Ante,* at 627, n. 16.   If the tax is in fact a legitimate general revenue measure identical or roughly comparable to taxes imposed upon similar industries, a court's inquiry is at an end; on the other hand, if the tax

---

[16] The degree to which a tax may be "exported" turns on such factors as the taxing jurisdiction's relative dominance of the market, the elasticity of demand for the product, and the availability of adequate substitutes. See, *e. g.,* McLure, Economic Constraints on State and Local Taxation of Energy Resources, 31 Nat. Tax J. 257, 257–259 (1978); Posner, at 510–512. Commentators are in disagreement over the likelihood that coal severance taxes are in fact exported. Compare, *e. g.,* McLure, at 259, and Gillis & Peprah, Severance Taxes on Coal and Uranium in the Sunbelt, Tex. Bus. Rev. 302, 308 (1980), with Church, at 277, and Griffin, at 33. It is clear, however, that that likelihood increases to the extent that the taxing States form a cartel arrangement. Gillis, at 308. See n. 5, *supra.* Whether the tax is in fact exported here is, of course, an issue for trial.

[17] There is no basis for the conclusion that the issues presented would be more difficult than those routinely dealt with in complex civil litigation. See, *e. g., Milwaukee* v. *Illinois,* 451 U. S. 304, 349 (1981) (dissenting opinion). "The complexity of a properly presented federal question is hardly a suitable basis for denying federal courts the power to adjudicate." *Id.,* at 349, n. 25.

singles out this particular interstate activity and charges it with a grossly disproportionate share of the general costs of government,[18] the court must determine whether there is some reasonable basis for the legislative judgment that the tax is necessary to compensate the State for the particular costs imposed by the activity.

. . To be sure, the task is likely to prove to be a formidable one; but its difficulty does not excuse our failure to undertake it. This case poses extremely grave issues that threaten both to "polarize the Nation," see H. R. Rep. No. 96–1527, pt. 1, p. 2 (1980), and to reawaken "the tendencies toward economic Balkanization" that the Commerce Clause was designed to remedy. See *Hughes* v. *Oklahoma,* 441 U. S. 322, 325–326 (1979). It is no answer to say that the matter is better left to Congress: [19]

> "While the Constitution vests in Congress the power to regulate commerce among the states, it does not say what the states may or may not do in the absence of congressional action . . . . Perhaps even more than by interpretation of its written word, this Court has ad-

---

[18] See n. 13, *supra.* Cf. *Maryland* v. *Louisiana,* 451 U. S. 725, 755, n. 27 (1981) (reciting argument of United States that use of 75% of proceeds of Louisiana's "First-Use Tax" to service general debt, and only 25% to alleviate alleged environmental damage from pipeline activities, suggests that tax was not fairly apportioned to value of activities occurring within the State).

[19] As the Court notes, the issue has not escaped congressional attention. *Ante,* at 628, n. 18. No bill, however, has yet been passed, and this Court is not disabled to act in the interim; to the contrary, strong policy and institutional considerations suggest that it is appropriate that the Court consider this issue. See Brown, at 222. Indeed, whereas Montana argues that the question presented here is one better left to Congress, in 1980 hearings before the Senate Committee on Energy and Natural Resources, the then Governor of Montana took the position that the reasonableness of this tax was "a question most properly left to the court," not a congressional committee. See Hearing on S. 2695 before the Senate Committee on Energy and Natural Resources, 96th Cong., 2d Sess., 237 (1980).

vanced the solidarity and prosperity of this Nation by the meaning it has given to these great silences of the Constitution." *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 534–535 (1949).

I would not lightly abandon that role.[20]  Because I believe that appellants are entitled to an opportunity to prove that, in Holmes' words, Montana's severance tax "embodies what the Commerce Clause was meant to end," I dissent.[21]

---

[20] Justice Holmes' words are relevant:

"I do not think the United States would come to an end if we lost our power to declare an Act of Congress void.  I do think the Union would be imperiled if we could not make that declaration as to the laws of the several States.  For one in my place sees how often a local policy prevails with those who are not trained to national views and how often action is taken that embodies what the Commerce Clause was meant to end." O. Holmes, Law and the Court, in Collected Legal Papers 291, 295–296 (reprint, 1952).

[21] I agree with the Court that appellants' Supremacy Clause claims are without merit.