The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY; Burlington Northern Railroad Company; Chicago and North Western Transportation Company; Illinois Central Gulf Railroad Company; Norfolk and Western Railway Company; Richard B. Ogilvie, Trustee of the Property of Chicago, Milwaukee, St. Paul and Pacific Railroad Company, Debtor; and Union Pacific Railroad Company, Appellants,

v.

Gerald D. BAIR, Director of Revenue of the Iowa Department of Revenue; Iowa Department of Revenue; Iowa Railway Finance Authority; Maurice E. Baringer, Treasurer of Iowa and Custodian of the Special Railroad Facility Fund; Raymond L. Kassel, Director of Transportation of the State Department of Transportation; State Transportation Commission of the State Department of Transportation; and State Department of Transportation, Appellees.

Iowa Railroad Shippers Company, Intervenor.

No. 69397.

Supreme Court of Iowa.

Sept. 21, 1983.

Rehearing Denied Oct. 13, 1983.

Carter, J., concurred specially and filed opinion.

McCormick, J., dissented and filed opinion, in which Harris, Larson and Wolle, JJ., joined.

Bennett A. Webster, Frank W. Davis, Jr., and Brent B. Green of Gamble, Riepe, Burt, Webster & Davis, Des Moines, and Sheldon I. Fink, William T. Barker, and Maureen Martin of Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., for appellants.

Thomas J. Miller, Atty. Gen., Harry M. Griger, Sp. Asst. Atty. Gen., and Lester A. Paff, Asst. Atty. Gen., and Donald A. Wine, Stephen W. Roberts, and David W. Dunn of Davis, Hockenberg, Wine, Brown & Koehn, Des Moines, for appellees.

E. Kevin Kelly, Des Moines, for intervenor.

UHLENHOPP, Justice.

This appeal requires us to consider the validity of an Iowa tax which is challenged by plaintiff railroads, all of which are interstate carriers subject to the jurisdiction of the Interstate Commerce Commission (ICC). The State claims the tax is a salutory effort to require the entire Iowa railroad industry to help support the rehabilitation of its members who are in financial trouble. Unfortunately, the problem is not that simple, primarily because of an act of Congress prohibiting discriminatory taxation of railroads.

The financial condition of most American railroads deteriorated over a number of years. Part of the problem was over-capacity, in the words of one expert, "too much track chasing too little traffic." The first significant response by Congress was enactment of the Regional Rail Reorganization Act of 1973 (3–R Act) which, inter alia,

established a Rail Services Planning Office in the ICC.

■ The finances of railroads continued to deteriorate, however, and Congress next enacted the Railroad Revitalization and Regulatory Reform Act of 1976 (4–R Act), which declared a national policy to "foster competition among all carriers by railroads and other modes of transportation." 45 U.S.C. § 801(b)(1) (1982 Supp.). The act made a major commitment of federal financing for railroad rehabilitation and improvement to selected railroads "according to the degree to which they are essential to the rail transportation system." 45 U.S.C. § 823(b)(1) (1982 Supp). The act resulted in ascertaining "corridors of excess capacity," and it eased procedures for abandonment of uneconomic railroad lines. In fostering competition among the several modes of transportation, the act also contained what is now section 11503 of title 49, United States Code (1983 Supp.), which proscribes discriminatory state taxation of railroads.

The condition of most railroads continued to worsen, and Congress eventually enacted the Staggers Rail Act of 1980, which substantially reduced regulatory control of rail rates, limited state authority to regulate in-state rail rates, and further eased abandonment procedures.

In 1981, the Iowa General Assembly enacted a special excise tax on railroads measured by the amount of fuel consumed to propel railway vehicles in the state. 1981 Iowa Acts ch. 3, § 29 (codified at Iowa Code §§ 324A.1 et seq. (1981)). Revenue from the tax is placed in a special railroad facility fund, § 324A.9, for use in carrying out the functions of the Iowa Railway Finance Authority (Authority).

Creation of the Authority in section 307B.5 appears to be the result of reduced rail service in Iowa in recent years due to the railroads' increasing financial difficulties. Legislative findings on which creation of the Authority were predicated include:

[3.] There will exist a serious shortage of viable rail lines and railway facilities serving the urban, rural, agricultural and industrial communities of the state.

4. There exists a serious problem in this state regarding the ability of agricultural producers to transport economically farm products to traditional markets because of the abandonment and possible abandonment of railway facilities within the state.

5. These conditions are making it more and more difficult for farmers and farm related businesses to survive in the present state of the economy thus threatening the very heart blood of Iowa.

6. One major cause of this condition has been recurrent shortages of funds in private channels and the high interest cost of borrowing.

7. These shortages have contributed to reductions in construction of new railway facilities, and have made the sale, purchase and repair of existing railway facilities a virtual impossibility in many parts of the state.

8. Iowa faces the possible consequences of two railroad bankruptcies and further reductions in service by other railroads due to deteriorating rail facilities. The loss of rail service on three thousand ninety miles may be the immediate consequence of the bankruptcies, with a resultant increase in transportation costs. This will be accompanied by a reduction in Iowa farm income. Any prolonged loss of service on the essential portions of these rail facilities means the loss of jobs in Iowa and a loss to the state economy.

9. A stable supply of adequate funds for financing of railway facilities is required to encourage construction of railway facilities, the rehabilitation of existing facilities and to prevent the abandonment of others in an orderly and sustained manner and to reduce the problems described in this section.

10. It is necessary to create a railway finance authority to encourage the investment of private capital and stimulate the construction, rehabilitation and repair of railway facilities and to prevent the

abandonment of others through the use of public financing, publicly assisted financing and other forms of public assistance.

Iowa Code § 307B.3 (1983).

The General Assembly created the Authority for the purpose of "providing for the financing of railway facilities and enhancing and continuing the operation of railway facilities. . . ." § 307B.5. The "[d]eclaration of necessity and purpose" for the Authority states in part in section 307B.2:

> Access to adequate railway transportation facilities is essential to the economic welfare of the state. One purpose of this chapter is to preserve or provide for the citizens of Iowa those railway services now in existence or needed in the state which have a viable future but which for a variety of economic and legal reasons may not exist if the state does not provide the financing or other mechanisms referred to in this chapter. It is the intent of the chapter that any public ownership and control of railway facilities provided for in this chapter be transferred to private ownership as promptly as economically practicable subject to financing requirements. It is further intended that the authority created in this chapter be vested with all powers to enable it to accomplish the purposes of this chapter.

The record indicates the Authority contemplated using money from the special fund, derived in part from the railroad excise tax in question, to purchase various abandoned lines, especially the north-south "spine line" of the Rock Island Railroad running through Iowa which was abandoned after the Rock Island entered bankruptcy. The State would then either lease the abandoned lines to railroad competitors or eventually sell them back to the railroads. The Soo Line Railroad and the Chicago Northwestern Transportation Company made formal bids to the bankruptcy trustee and court to purchase the abandoned Rock Island spine line. The North-

western was eventually allowed to purchase it.

The special excise tax was to go into effect on October 1, 1981. Iowa Code § 324A.3. Plaintiff railroads, however, filed a petition in equity on November 6, 1981, asking that collection of the tax be temporarily enjoined. Iowa Railroad Shippers Company intervened on the side of the railroads. A temporary injunction was granted on December 28, 1981, and trial of the action was held in January 1982.

The railroads challenged the tax on various grounds, the trial court upheld the tax, and the railroads appealed. In this court the railroads narrowed their attack to three grounds. They first contend the tax discriminates against rail carriers contrary to section 11503 of title 49, United States Code. Next, they claim the tax violates the Supremacy Clause in Article VI, Section 2, of the United States Constitution. They argue that while Congress has streamlined the railroad industry to the lines which can survive and has forbidden discriminatory taxation in order to assist the viable lines, the General Assembly has burdened those lines with a tax for the purpose of helping the railroads to be abandoned. In this the railroads see a conflict of policies implicating the Supremacy Clause. Finally, the railroads urge that the tax contravenes the Commerce Clause in Article I, Section 8, of the United States Constitution because it is unrelated to services the state furnishes the railroads. *Complete Auto Transit Inc. v. Brady,* 430 U.S. 274, 277–78, 97 S.Ct. 1076, 1078, 51 L.Ed.2d 326, 330 (1977). They assert that the revenue from the tax will not benefit them and in some instances will be used to compete against them.

■ Prefatorially, we note that state taxes carry a presumption of validity. *City of Pittsburgh v. Alco Parking Corp.,* 417 U.S. 369, 375, 94 S.Ct. 2291, 2295, 41 L.Ed.2d 132, 138 (1974); *State ex rel. Bishop v. Travis,* 306 N.W.2d 733, 735 (Iowa 1981).

I. *Violation of section 11503?* The railroads argue the state excise tax violates that portion of the Revised Interstate Commerce Act codified as section 11503(b)(4) of

title 49, United States Code. Subsection (b) of that section provides:

(b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

(1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection.

(3) levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) *impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title.*

(Emphasis added.)

█ Sections 10101 and following of the Revised Interstate Commerce Act of 1978 recodified subtitle IV of title 49, United States Code. 49 U.S.C. §§ 10101 *et seq.* Section 11503 recodified section 306 of the 4–R Act, which was originally codified as section 26c of title 49, United States Code (1976). The legislative purpose of the Revised Interstate Commerce Act of 1978 was

[t]o restate in comprehensive form, *without substantive change,* the Interstate Commerce Act.... In the restatement, simple language has been substituted for awkard and obsolete terms....

H.R. No. 95–1395, reported in 1978 U.S. Code Cong. & Admin.News 3013 (emphasis added). *See also Alabama Great Southern R.R. v. Eagerton,* 663 F.2d 1036, 1037 (11th Cir.1981) (language of § 11503 cannot be construed as making a substantive change in § 306).

Section 306 of the 4–R Act reads in pertinent part:

Section 306. Part I of the Interstate Commerce act (49 U.S.C. 1 et seq.), as amended by this Act, is further amended by inserting therein a new section 28 as follows:

"Sec. 28. (1) Notwithstanding the provisions of section 202(b), any action described in this subsection is declared to constitute an unreasonable and unjust discrimination against, and an undue burden on, interstate commerce. It is unlawful for a State, a political subdivision of a State, or a governmental entity or person acting on behalf of such State or subdivision to commit any of the following prohibited acts:

"(a) The assessment (but only to the extent of any portion based on excessive values as hereinafter described), for purposes of a property tax levied by any taxing district, of transportation property at a value which bears a higher ratio to the true market value of such transportation property than the ratio which the assessed value of all other commercial and industrial property in the same assessment jurisdiction bears to the true market value of all such other commercial and industrial property.

"(b) the levy or collection of any tax on an assessment which is unlawful under subdivision (a).

"(c) The levy or collection of any ad valorem property tax on transportation property at a tax rate higher than the tax rate generally applicable to commercial and industrial property in the same assessment jurisdiction.

"(d) The imposition of *any other tax* which results in discriminatory treatment of a common carrier by railroad subject to this part."

(Emphasis added.) We thus construe section 11503 in light of the language in section 306.

Initially, section 306 did not contain subsection (d). A Senate report at that time stated the purpose of section 306 was

[t]o eliminate the longstanding burden on interstate commerce resulting from discriminatory State and local taxation of common and contract carrier transportation property.... Substantively [this section] would amend the Interstate Commerce Act to declare unlawful, as an unreasonable and unjust discrimination against and an undue burden upon interstate commerce, a State or local tax rate, assessment, or collection upon the transportation property of a common or contract carrier at a higher level than upon property in the same taxing district. Procedurally, it would provide a remedy in the Federal courts for common and contract carriers against the collection of the excessive portion of any tax based upon such unlawful assessment or rate.

Senate Report No. 91–630, 91st Cong., 1st Sess. (1969). *See also Ogilvie v. State Board of Equalization of North Dakota,* 657 F.2d 204, 206 (8th Cir.1981), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981). Subsequently, when the Senate and House developed separate bills, subsection (d) was added in conference committee. *Alabama Great Southern R.R. v. Eagerton,* 663 F.2d 1036, 1040–41 (11th Cir.1981).

A. With this legislative history as background, we first inquire whether section 11503 applies at all in the present context. The State argues section 11503 prohibits only discriminatory *property* taxes and not excise taxes such as we have here. Relying first on principles of statutory construction, the State points to the title of section 11503: "Tax discrimination against rail transportation property." It also notes the prohibited taxes in subsections (1), (2), and (3) all refer to property taxes, and it concludes that the words of subsection (4) [of section 306], "impose any other tax that discriminates", must refer to any other *property* tax. We do not think so.

The title of a statute or heading of a section cannot limit the plain meaning of the text. *Brotherhood of Railroad*

*Trainmen v. Baltimore,* 331 U.S. 519, 528, 67 S.Ct. 1387, 1392, 91 L.Ed. 1646, 1652 (1947). We are unable to read Congress' words "any other tax" to mean "any other property tax".

Our conclusion finds support in *Alabama Great Southern R.R. v. Eagerton,* 663 F.2d 1036 (11th Cir.1981). The court there held section 11503 applies to a business license tax, as against the argument the section applies only to property taxes:

It would be difficult to imagine statutory language that would be less needful of construction than the "any other" language used here. Following three subparagraphs, (a), (b) and (c) dealing with taxation of "transportation property," paragraph (d) then forbids "the imposition of *any other tax* which results in discriminatory treatment of a common carrier by railroad." Without invoking any of the ordinary rules of construction, it would appear that paragraph (d) is indeed intended as a catchall provision to prevent discriminatory taxation of a railroad carrier by any means. This view is greatly strengthened when we consider the avowed purpose of the Act which has been clearly set forth by the Court of Appeals for the Eighth Circuit which has now affirmed the *Ogilvie* case:

As noted in our review of the history of this section, its purpose was to prevent tax discrimination against railroads in any form whatsoever.

*Ogilvie v. State Board of Equalization,* 657 F.2d 204, 210 (8th Cir.1981).

*Id.* at 1040.

The trial court in *Ogilvie* held: "The phrase 'any other tax' obviously means a tax not referred to in subsections (1)(b) or (c)...." *Ogilvie v. State Board of Equalization of North Dakota,* 492 F.Supp. 446, 454 (D.N.D.1980), *aff'd,* 657 F.2d 204 (8th Cir.1981). The United States Court of Appeals for the Eighth Circuit recently made clear again that section 11503 is not limited to property taxes:

Section 306(1)(d), rather than proscribing specific types of tax discrimination against "transportation property" like

subdivisions (1)(a) through (c), prohibits "the imposition of any other tax which results in the discriminatory treatment of a common carrier by railroad." As the Fifth Circuit noted in *Alabama Great Southern Railroad Co. v. Eagerton,* 663 F.2d 1036, 1041 (11th Cir.1981), however, Congress' purpose in changing the language of section 306 from "transportation property" in subdivisions (1)(a) through (1)(c) to "any other tax" and "common carrier by railroad" in subdivision (1)(d) was most likely to broaden, not narrow, the scope of the section by *making it applicable to all forms of state taxation rather than just property taxation.*

*Trailer Train Co. v. State Board of Equalization of North Dakota,* 710 F.2d 468, 472 n. 6 (8th Cir.1983) (emphasis added).

■ The State also urges application of the doctrine of *ejusdem generis,* that general words (any other tax), following enumeration of specific terms (property taxes), apply only to the kinds of taxes previously enumerated. We do not find the doctrine to be applicable here. The United States Supreme Court has recently stated that this doctrine is to be used only where the meaning of words is uncertain. *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 589, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525, 535 (1980). We see no uncertainty in the clear and unambiguous words "any other tax." As pointed out by the court in *Eagerton,* 663 F.2d at 1041:

The Supreme Court made that clear in the *Gordon* case [*Gordon v. Appeal Tax Court,* 44 U.S. (3 How.) 132, 11 L.Ed. 529 (1845)], where the Court said: "The words 'any further tax' ... will, by common consent ... be intended to mean any additional tax besides that referred to, and not any further like tax." 44 U.S. at 147 [11 L.Ed. at 536].

■ The State contends that the legislative history of section 11503 supports its view that Congress intended to prohibit only discriminatory property taxes. We have examined the material the State cites. Acts of Congress, however, must be interpreted in light of the spirit in which they

were written and the reasons for their enactment. *General Service Employees Union Local No. 73 v. NLRB,* 578 F.2d 361, 366 (D.C.Cir.1978). As already quoted in *Eagerton,* the federal court of appeals for this circuit stated the purpose of section 11503 "was to prevent tax discrimination against railroads in any form whatsoever." *Ogilvie v. State Board of Equalization of North Dakota,* 657 F.2d 204, 210 (8th Cir.1981). Moreover, as also stated in *Eagerton,* "a mere prohibition against discriminatory property taxes would be without effect if a state were to be permitted to enact any other discriminatory tax." 663 F.2d at 1041. In addition, the words in the conference report which the State relies on ("limited ... to taxation of railroad property") appear to distinguish property of *railroads* from property of *all carriers* as included in the Senate bill under consideration in the report. Sen.Rep. No. 94–595, 94th Cong., 2d Sess. (1976), U.S.Code Cong. & Admin. News 1976, p. 14.

The Court of Appeals in *Eagerton* reached this conclusion about the state's argument of legislative history:

Finally, the legislative history seems to us to cut the other way from that urged by the state of Alabama. The earlier bills did not contain anything like subsection (d). They were primarily concerned with an important *existing* discrimination in property taxes. Then, as stated by the appellee in its brief here: "Section 11503(b)(4) [correctly stated it should be section 306(1)(d) ] does not appear to have been included in any of the debates. Instead, it seems to have been added at the last minute almost as an afterthought." Of course, such debates as were had on the bill, under such circumstances, usually included the words "property" or "transportation property." But, towards the end of the debate, it must have become plain to Congress that a mere prohibition against discriminatory property taxes would be without effect if a state were to be permitted to enact any other discriminatory tax, so long as it was not a property tax. The appellees would have us

ignore subparagraph (d) because they do not understand why Congress added it "almost as an afterthought." We cannot give such cavalier treatment to a formal act of Congress, or a part of it that seems clearly within the purpose and intendment of the law.

663 F.2d at 1041.

■ In holding section 11503 applies to excise taxes, we note that the United States District Court for the Southern District of Iowa, faced with the same parties and issues, so held. *Atchison, Topeka & Santa Fe R.R. v. Bair,* 535 F.Supp. 68 (S.D.Iowa 1982). Proceedings in that case have been stayed pending disposition of the present litigation. We also note that the anti-discrimination section applicable to trucks is in fact limited to property taxes; it contains paragraphs (1), (2), and (3), but not paragraph (4) relating to other taxes. *Compare* § 11503 *with* § 11503a, 49 U.S.C. (1983 Supp.).

B. We thus approach the central question regarding section 11503: does the Iowa excise tax discriminate against railroads? The first problem involved in that question is this: with what other taxpayers and taxes do we compare the railroad fuel tax?

■ Because individuals and corporations in business usually have property in their enterprises, a tax on railroad property is compared with state taxes on property of commercial and industrial taxpayers generally. *Alabama Great Southern R.R. v. Eagerton,* 541 F.Supp. 1084, 1086 (M.D.Ala. 1982); *see Trailer Train Co. v. State Board of Equalization of North Dakota,* 710 F.2d 468, 477 (8th Cir.1983); *Ogilvie v. State Board of Equalization of North Dakota,* 657 F.2d 204, 209 (8th Cir.1981). Property taxes of railroads must be nondiscriminatory when compared with property taxes of each and every other class of commercial and industrial taxpayer. *Arizona v. Atchison, Topeka & Santa Fe R.R.,* 656 F.2d 398, 404 (9th Cir.1981); *Ogilvie,* 492 F.Supp. at 455.

■ This particular tax, however, is not on property. It is on the burning of propulsion fuel in part of the transportation industry, the railroads. For relevant comparisons we must thus look to taxpayers who employ propulsion fuel in transportation. This narrows the field of comparison, in the main, to three other transportation modes: trucks, barges, and aircraft. Drawing on the analogy of property taxes, the present excise tax must be nondiscriminatory compared with fuel taxes on any of these other modes so as to avoid a competitive disadvantage.

■ In making the comparison with taxation of fuels burned by the other three modes, two limitations must be observed. First, we do not consider the whole tax structure of the state. *Arizona v. Atchison, T. & S.F.R.R.,* 656 F.2d 398, 404 (9th Cir. 1981); *Alabama Great Southern R.R. v. Eagerton,* 541 F.Supp. 1084, 1086 (M.D.Ala. 1982); *Ogilvie v. State Board of Equalization of North Dakota,* 492 F.Supp. 446, 455 (D.N.D.1980), *aff'd,* 657 F.2d 204 (8th Cir. 1981). Second, because section 11503 is a prohibition on discriminatory *state* taxation of railroads, we compare *Iowa* fuel taxes on the several transportation modes; we do not add *federal* taxation to the equation. *Arizona Public Service Co. v. Snead,* 441 U.S. 141, 150, 99 S.Ct. 1629, 1634, 60 L.Ed.2d 106, 113 (1979).

We thus turn to the actual step of making comparison, to the extent made possible by the record before us. The only tax which Iowa exacts regarding railroad fuel is the present one on the burning of fuel within the state, at the rate of three cents per gallon originally and eight cents per gallon since July 1, 1982.

■ *Trucks.* Competition for freight between railroads and trucks is intense; trucks have taken much of that traffic. In general, the Iowa excise tax regarding truck fuel, burned in the state, is thirteen cents per gallon for gasoline, ten cents per gallon for gasohol, and fifteen and one-half cents per gallon for diesel. Iowa Code §§ 324.3, .34, .52, .54.

Superficially the trucks rather than the railroads appear to be at a competitive disadvantage as to fuel taxes. But a major

adjustment must be made in order to compare railroad-fuel with truck-fuel taxes: the costs of construction and maintenance of the roads of the two modes must be placed in the balance. Trucks operate on publicly constructed and maintained roads. The various taxes which the General Assembly requires the trucks to pay go into an earmarked fund for the construction, maintenance, supervision, and administration of the highways. Iowa Const. Amend. 18. Those taxes represent the Assembly's judgment as to the portion of the cost of the highways that the trucks should bear. But the railroads acquire, construct, maintain, and pay taxes on their own roads. We thus have the railroads providing their own roads with the eight-cent fuel tax in addition, and the trucks paying the legislative approximation of their share of the highways without the additional eight-cent tax. This gives the trucks a distinct competitive advantage.

The State counters that plaintiff railroads could themselves apply for moneys from the railroad fuel tax fund. If the record demonstrated that plaintiff railroads will be taxed eight cents per gallon but will get it back again, they would sustain no loss and no discrimination. The record establishes, however, that the fund is for rehabilitation of the debilitated railroad lines and branches, not for viable railroads. The state would hardly tax operating railroads eight cents per gallon simply to pay it back to them.

Comparing state fuel taxation of railroads and of trucks, the railroad tax in question discriminates against the railroads contrary to section 11503.

*Barges.* Presently and potentially, barges constitute a substantial and competitive transportation mode, especially in this area which is bounded by two great rivers. Barges generally use diesel fuel. They pay no Iowa excise tax on it, either in plying bordering rivers or in serving Iowa ports of call. They are not required to purchase diesel in Iowa, but they are subject to the Iowa sales tax of four percent of the price if they do purchase diesel in the state. *See*

*Dodgen Industries, Inc. v. Iowa State Tax Comm'n,* 160 N.W.2d 289, 294 (Iowa 1968). If barges buy none of their diesel in Iowa, they have a competitive Iowa tax advantage over railroads of eight cents per gallon for diesel. If they buy some or all of their diesel in Iowa, their competitive advantage is less, but it remains substantial. The railroads thus have a competitive Iowa tax disadvantage in comparison with barges.

At one time barges in navigable waters were considered immune from state taxation of fuel by virtue of the Commerce Clause. *Helson & Randolph v. Commonwealth of Kentucky,* 279 U.S. 245, 251, 49 S.Ct. 279, 281, 73 L.Ed. 683, 687 (1929). We believe *Helson* is no longer law as a result of *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Under *Complete Auto,* the challenger of a state tax must show that the activity taxed

> does not have a sufficient nexus with the State; or that the tax discriminates against interstate commerce; or that the tax is unfairly apportioned; or that it is unrelated to services provided by the State.

*Id.* at 277–78, 97 S.Ct. at 1078, 51 L.Ed.2d at 330. The question here relates to the first part of the test—a sufficient nexus. We believe that Iowa has a sufficiently significant relationship to barge traffic on its bordering rivers to satisfy that requirement. *See* 5 Stat. 742, § 3, 28th Cong., 2d Sess. (1845) (concurrent jurisdiction of Iowa over bordering rivers under act of admission into Union); Iowa Const. Preamble; Iowa Code (1983) §§ 1.1–.3; *Higman Towing Co. v. Cocreham,* 70 F.Supp. 628, 636–37 (E.D.La.1947), *aff'd* 165 F.2d 789 (5th Cir. 1948) (state statute taxing income of foreign barge operators on Mississippi upheld); *Witke v. State Conservation Comm'n,* 244 Iowa 261, 267, 56 N.W.2d 582, 586 (1953) (state may impose charges for use of improved waterway); 65 C.J.S. *Navigable Waters* § 10b (1966); *see also* 70 Am.Jur.2d *Shipping* § 50, at 322 (1973); 15 C.J.S. *Commerce* § 73, at 651 (1967); 80 C.J.S. *Shipping* § 4 (1953); *cf. Pfeiffer v. Weiland,* 226

N.W.2d 218, 220–21 (Iowa 1975) (maritime torts); *State v. Mullen,* 35 Iowa 199, 202 (1872) (crimes).

■ The State also argues that the question of apportionment—the third part of the *Complete Auto* test—would be difficult as between Iowa, on the one hand, and the surrounding states on the bordering rivers, on the other. Apportionment would be difficult and would pose administrative problems, but we do not think that a fair approximation, in a carefully drafted tax statute, is impossible or that administrative difficulties are insurmountable. An argument can also be made, if *Helson* is actually still the law so Iowa cannot tax barge fuel, that Iowa cannot tax railroad fuel either, because barges would otherwise have a *de facto* competitive state tax advantage contrary to the purpose of section 11503. We find no necessity to decide that point. Applying *Complete Auto Transit,* we hold that Iowa taxation of railroad fuel is discriminatory when compared with Iowa taxation of barge fuel, contrary to section 11503.

*Aircraft.* Competition between railroads and aircraft for freight does not appear momentous, but the possibility of some tax discrimination exists. Purchases in Iowa of aircraft fuel are subject to the four percent sales tax on the price. *See Dodgen Industries, Inc. v. Iowa State Tax Comm'n,* 160 N.W.2d 289 (Iowa 1968); *Chicago, B & Q. R.R. v. Iowa State Tax Comm'n,* 259 Iowa 178, 142 N.W.2d 407 (1966). In addition, aircraft fuel purchased outside Iowa but used intrastate is subject to the four percent use tax on the price. 1983 Iowa Legis. Serv.S.F. 184 § 5 (West). *See United Airlines v. Mahin,* 410 U.S. 623, 629, 93 S.Ct. 1186, 1191, 35 L.Ed.2d 545, 552 (1973). Aircraft pay the same excise taxes on gasoline (and gasohol) as trucks, but the tax is subject to refund. Iowa Code § 324.17. They pay no other excise taxes on aircraft fuel.

■ The result is that the most Iowa taxes that aircraft do in fact pay are four percent on the price. This constitutes a substantial competitive advantage over the eight-cent per gallon railroad fuel tax, constituting discrimination under section 11503.

We conclude that the railroad fuel tax violates section 11503 on comparison with each of the three other principal transportation modes.

■ II. *Violations of Supremacy and Commerce Clauses?* Since we have held that the Iowa excise tax violates section 11503, we leave the railroads' other two propositions undecided. We repeat our statement at the outset that we do not have a simple question of whether the railroad fuel tax is a salutary measure for Iowa railroads as a whole. We must consider the federal anti-discrimination statute and the reasons which prompted it. Under that statute we hold the Iowa railroad excise tax is invalid.

In taxing the costs, the clerk is directed to tax the expense for appendix and briefs at actual cost but not exceeding four dollars per page.

REVERSED.

All Justices concur except CARTER, J., who concurs specially, and McCORMICK, HARRIS, LARSON, and WOLLE, JJ., who dissent.

CARTER, Justice (concurring specially).

Although I cannot accept the court's reasoning as to why the railroad fuel tax is violative of 49 U.S.C. section 11503(b)(4), I agree that it is. I therefore concur in the result.

I do not find the court's comparison of the railroad fuel tax with other taxes levied incident to truck, barge, and air transportation to be helpful for purposes of applying section 11503(b)(4). The comparison which is made by the majority is based on supposed competitive disadvantage. Although the elimination of competitive disadvantage may have been one of the legislative purposes for the enactment of the statute, competitive disadvantage is not a practical standard by which to determine whether a tax is discriminatory. Too many variables are involved to make such comparisons meaningful.

I do not believe it would be possible under the test laid down by the majority to sustain any tax whose burden falls on interstate rail carriers if the incident of taxation differs from that employed in taxing other commercial taxpayers. I do not believe it was the intent of Congress to prohibit special tax treatment of interstate rail carriers under section 11503(b)(4) if the tax is tied to benefits which are conferred on interstate rail carriers. Where, however, a tailored tax on the activities of interstate rail carriers is placed in a separate fund to be expended for specific purposes, the carriers protected by section 11503(b)(4) must receive from that fund benefits which are proportionate to the tax imposed. In the present case, while some individual carriers may benefit from the use made of Iowa's railroad fuel tax, any benefits flowing to interstate rail carriers as a class are too tenuous to stave off the carrier's section 11503(b)(4) challenge.

McCORMICK, Justice (dissenting).

For me the determinative question is whether the challenged tax imposes a burden on railroads that is not uniformly placed on similarly situated commercial and industrial enterprises in Iowa. Before the tax can be held to violate 49 U.S.C. 11503(b)(4), plaintiffs must prove it is discriminatory on this basis. Because I believe they did not prove discrimination and have failed to establish any other ground for invalidating the tax, I would affirm the trial court.

Discrimination does not occur unless equals are treated unequally. One problem the railroads therefore have is in showing who their equals are in the business community for purposes of the federal statute. Congress defined the comparison group for determining whether a property tax violates the statute but did not identify the comparison group for evaluating other taxes. The comparison group for property taxes is "commercial and industrial property," defined in section 11503(a)(4) as "property, other than transportation property and land used primarily for agricultural purposes or

timber growing, devoted to a commercial or industrial use and subject to a property tax levy." Property taxes on railroads thus must be nondiscriminatory when compared with property taxes on the businesses in the defined group. *See generally Arizona v. Atchison, Topeka & Santa Fe R.R.*, 656 F.2d 398, 403–06 (9th Cir.1981).

Before a comparison group for the present tax can be defined, it is necessary to decide what is to be compared. This inquiry is not answered solely by identifying the taxable event. The precise taxable event here is the consumption of diesel fuel within Iowa for the propulsion of a railway vehicle. If the inquiry stopped there, the only comparison group would seem to be businesses other than railroads that operate railway vehicles. Certainly no discrimination has been shown on that basis. It is doubtful that Congress would have intended the comparison group to be so limited. I believe the separate treatment of property taxes under 11503(b) proves that the character of the tax provides the basis upon which the comparison group is to be identified. The state has labeled the tax a privilege tax. *See* Iowa Code § 324A.3 (1981). Privilege taxes are therefore the taxes that are to be compared. Privilege taxes are explained and distinguished from other taxes in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

The federal statute, by its terms, delineates acts that Congress has determined will "unreasonably burden and discriminate against interstate commerce ....." § 11503(b). A violation of the statute thus turns on the character of the tax as burdensome and discriminatory upon interstate commerce. It is the impact of the tax upon the taxpayer's relative position in interstate commerce that is significant. In subsections (1), (2), and (3), Congress has effectively decided the issue by requiring absolute parity in property tax rates. In subsection (4), however, the statute bars "another tax that discriminates against a rail carrier ....." The test under subsection (4) is therefore not one of parity but of discriminatory impact. *See Alabama Great*

*Southern R.R. Co. v. Eagerton,* 663 F.2d 1036, 1040 (11th Cir.1981). Consequently I believe that to show a violation of section 11503(b)(4), the railroads must prove that the tax, regardless of the exact taxable event on which it is based, results in a disproportionate economic burden on railroads when compared to privilege taxes on other businesses engaged in interstate commerce.

I would therefore examine the relative burden of privilege taxes on similarly situated businesses rather than "competitive disadvantage" resulting from the tax. The approach I advocate is consistent with *Arizona Public Service Co. v. Snead,* 441 U.S. 141, 99 S.Ct. 1629, 60 L.Ed.2d 106 (1979), because it involves consideration only of the burden from the type of tax involved rather than the impact upon a particular business of the state's entire tax structure. Competitive disadvantage cannot be determined through the requisite limited inquiry.

Furthermore, in attempting to identify similarly situated businesses, it is logical to look at transportation modes because they are most likely to have similar characteristics. In doing so, however, differences in the nexus between the state and particular business must be taken into account. This is a factor the court's opinion wholly omits from consideration. Discrimination cannot be shown unless the privilege tax burden on businesses similarly situated is unequal when allowances are made for differences in the activities of the businesses within the state. This is because the state is entitled to measure the tax in accordance with the extent of the taxpayer's activities in the state. *See Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 627, 101 S.Ct. 2946, 2958, 69 L.Ed.2d 884, 900 (1981).

The only transportation mode that has activities in Iowa comparable to those of railroads is the trucking industry. As the court acknowledges, airplanes are not major competitors of trains. In addition, the extent of their activities within the state is limited. Barge routes are unique, and I question whether barges constitute competition as much as a complementary system of transportation. In any event, the extent of barge contact with the state is minimal. Trucks do have activities in the state similar to those of trains. They also pay a substantially higher tax on fuel consumption than do railroads. *See* Iowa Code § 324.34 (1983). Therefore I would not find that the tax on diesel fuel consumption is discriminatory when railroads are compared to the trucking industry.

Moreover, I do not think the disposition of the revenues is relevant. The railroad tax is earmarked for use by the Railway Finance Authority, and the trucking fuel tax is earmarked under Iowa Const. art. VII, § 8 for highway purposes. Although the "competitive disadvantage" may vary, the burden on the industry is not different merely because of earmarking of the revenues. In each instance the tax is a general revenue measure. In one instance the legislature has dictated a particular use for the money, and in the other the people have dictated a particular use. The earmarked funds, however, might as well have come from general revenues. This is consistent with the approach set out for property taxes under 11503(b), which includes no consideration of benefits received.

If benefits to the taxpayer were relevant, the relative value of other government services such as police and fire protection should be considered. If benefits that are paid for by the tax are relevant, so are benefits that are not paid for by it. In addition, a determination should be made of the actual share of highway costs paid by the truck tax, other privilege taxes such as license fees paid by trucks should be considered, and a calculation should be made of any economic benefit to railroads as a group from projects to be funded by the Railway Finance Authority. Therefore, even if benefits to the railroads were relevant, the record is wholly inadequate to prove discrimination on that basis. I do not believe, however, that benefits are relevant.

The issue is the relative burden of the tax. This is the test that was applied in *Alabama Great Southern R.R. Co. v. Eagerton,* 541 F.Supp. 1084 (M.D.Ala.1982). In

that case a railroad license tax was compared to other business license taxes. It was computed on a percentage of gross receipts while other businesses except utilities were taxed at a flat rate. The resulting burden on a rail carrier was 350 times the license tax on any Alabama commercial or industrial taxpayer other than utilities. After comparing the relative burden, and relying on expert testimony concerning the issue, the court held that the tax was discriminatory.

In the present case, no evidence of disproportionate burden appears. If anything, the trucking industry carries a heavier burden, perhaps for good reason. Air and barge modes of transportation have substantially less nexus with the state. When the differences in the extent of their contacts with the state and those of railroads are taken into account, it cannot fairly be said that the tax on railroad fuels results in a greater relative burden. Therefore I would hold that the railroad tax has not been shown to be discriminatory.

Because I would also hold that the railroad's constitutional arguments are without merit, I would affirm the trial court.

HARRIS, LARSON and WOLLE, JJ., join this dissent.