The **DEPARTMENT OF REVENUE,**
State of Colorado, Defendant–
Appellant,

v.

**DURANGO & SILVERTON NARROW
GAUGE RAILROAD COMPANY,**
Plaintiff–Appellee.

No. 98CA0426.

Colorado Court of Appeals,
Div. II.

May 13, 1999.

Rehearing Denied June 17, 1999.

Certiorari Denied Dec. 13, 1999.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Carolyn Lievers, Assistant Attorney General, Denver, Colorado, for Defendant–Appellant.

Jones & Keller, P.C., Edward T. Lyons, Jr., Jennifer L. Arthur, Denver, Colorado, for Plaintiff–Appellee.

Opinion by Judge CRISWELL.

The Colorado Department of Revenue (department) appeals from the summary judgment entered by the district court in *de novo* review proceedings pursuant to § 39–21–105, C.R.S.1998, instituted by Durango & Silverton Narrow Gauge Railroad Co. (railroad) that reversed a determination by the department's executive director and directed that the department refund to the railroad certain sales and tourism taxes previously collected. We affirm.

The undisputed material facts reveal the following.

The railroad, which was organized under Colorado statutes as a railroad company, operates a 45–mile narrow gauge railroad line between Durango and Silverton. The rail line has been operated by the railroad and its predecessors in interest as a common carrier since 1882, but the line was, until recent years, operated as a part of a larger system.

Until 1993, the railroad was regulated by the federal Department of Transportation (exercising those powers previously exercised by the Interstate Commerce Commission), and it presently is regulated by the Colorado Public Utilities Commission. As a common carrier, the railroad is required to publish schedules and tariffs and to maintain those schedules irrespective of the volume of traffic that may be tendered to it. Likewise, its charges for its services are governed by its published tariffs.

The railroad carries some freight over its line, but approximately 99% of its revenues is derived from passenger fares. Although some persons use the line to access work or vacation sites from one or more of the five stops along the route, most of its passengers ride on a round-trip basis between Durango and Silverton.

During the carriage of passengers over this line, the railroad sells various items of food and beverages. In addition, it sells souvenirs, such as bandannas, engineer caps, and guidebooks.

During the pertinent period, the railroad was licensed as a retail vendor under the Emergency Retail Sales Tax Act of 1935 (sales tax statute), *see generally* § 39–26–101, et seq., C.R.S.1998, and it collected and paid appropriate sales tax on its sale of souvenirs. However, it did not collect or pay any sales tax on its sale of food items.

In addition, it did not collect or pay the tax levied by the now repealed Tourism Promotion Fund Tax (tourism tax), *see* Colo. Sess. Laws 1993, ch. 352 at 2147, et seq., on either the food items or the tickets sold by it.

Based on the railroad's failure to pay these taxes, the executive director issued notices of deficiency to it and, after an evidentiary hearing, entered an order requiring the railroad to pay some $33,000 in unpaid sales taxes and some $76,000 in unpaid tourism taxes.

The railroad paid these assessments under protest and then sought review of the director's order pursuant to § 39–21–105, C.R.S.1998, which requires that that decision be reviewed on a *de novo* basis. In those review proceedings, both parties moved for summary judgment, and the trial court entered its judgment requiring a refund of all of the taxes ordered to be paid. In doing so, it concluded that § 40–20–109, C.R.S.1998, exempted the railroad's sale of items of food and beverages from the sales tax and that the railroad was not a "private tourist attraction" upon which the tourism tax was imposed.

It is from this judgment that the department appeals.

### I. *The Sales Tax*

The determination of the question whether the railroad must collect and pay sales taxes on sales of food items and beverages sold by it to passengers on its line depends upon whether § 40–20–109, which was initially adopted in 1891, exempts the railroad from such taxes. The department argues that the trial court erred in concluding that it resulted in such an exemption. We disagree.

Section 40–20–109 provides that:

No person or corporation shall be required *to obtain or pay* any town, city, county, or state *license or tax* within the State of Colorado by reason of *furnishing or serving* to passengers upon any railroad train meals, luncheons, or refreshments in any hotel car, dining car, or buffet car operated by such person or corporation. (emphasis supplied)

Under § 39–26–104(1)(a), C.R.S.1998, the sales tax is an excise tax:

On the purchase price paid or charged upon all sales and purchases of tangible personal property at retail....

Under § 39–26–104(1)(e), C.R.S.1998, the tax is also payable:

Upon the amount paid for food or drink *served or furnished* in or by restaurants, cafes, lunch counters, cafeterias, hotels, drugstores, social clubs, nightclubs, cabarets, resorts, snack bars, caterers, carryout shops, and other like places of business at which prepared food or drink is regularly sold, including sales from ... *other mobile facilities.* (emphasis supplied)

Section 39–26–114, C.R.S.1998, contains a list of exemptions from the sales tax. Nothing within this statute, however, makes specific reference to the sales of food in rail cars as described in § 40–20–109. It does exempt from the sales tax:

All sales which the State of Colorado is prohibited from taxing under the constitution or *laws* of the United States or the State of Colorado....

Section 39–26–114(1)(a)(III), C.R.S.1998 (emphasis supplied).

■ The sales tax statute requires each retail vendor to obtain a license, § 39–26–103(1)(a), C.R.S.1998, to add the tax to the sales price of the product sold, to collect that tax from the purchaser, § 39–26–106, C.R.S. 1998, and to remit the same (less collection costs) to the director. Section 39–26–105, C.R.S.1998. Hence, it is generally considered that the sales tax is levied upon the purchaser and that the vendor acts as an agent of the state charged with its collection. *See J.A. Tobin Construction Co. v. Weed,* 158 Colo. 430, 407 P.2d 350 (1965).

However, this statute also provides that the vendor itself shall be "liable and respon-

sible for the payment of an amount equivalent" to the amount of the tax required to be collected. . Section 39–26–105(1)(a), C.R.S. 1998. Under this statute, therefore, the term "tax" is defined as *either* the amount payable by the purchaser *or* "the aggregate amount of taxes due from the vendor...." Section 39–26–102(16), C.R.S.1998. Likewise, a "taxpayer" under this statute may mean "any person obligated to account to the executive director ... for the taxes collected under [its] terms," depending upon the context within which that term is used. Section 39–26–102(17), C.R.S.1998.

Under the explicit terms of the sales tax statute, therefore, it would be illegal for the railroad to sell food or beverages at retail without obtaining a license therefor. *See* § 39–26–103(1)(a). Yet, the requirement for obtaining such a license is explicitly prohibited by § 40–20–109. Quite aside from any other consideration, therefore, the sales tax statute's requirement for a license would appear on its face to be inconsistent with the ban of § 40–20–109.

In addition, however, we agree with the trial court that the sales tax statute's creation of a liability upon the railroad for payment of the tax would also be inconsistent with § 40–20–109's prohibition against requiring a railroad to "pay ... any tax" for furnishing or serving food to its passengers.

■ Relying upon the well-accepted premise that taxation is the rule and exemption the exception and that the burden is on the taxpayer to prove the existence of any exemption, *see Security Life & Accident Co. v. Heckers,* 177 Colo. 455, 495 P.2d 225 (1972), the department advances three principal reasons why § 40–20–109 cannot be interpreted to exempt the railroad from obtaining a license or collecting and paying the tax levied by the sales tax statute. However, we find none of these reasons are persuasive.

■ First, the department notes that the exemption statute describes the exempted activity as that of "furnishing or serving [food] to passengers," rather than that of "selling" to passengers. From this premise, the department argues that the exemption applies only when the railroad *gives away* its

food and drink, not when it *sells* those commodities.

This argument, however, overlooks the fact that the sales tax statute itself, in describing one of the events that will trigger the requirement for the payment of the tax, refers to "food or drink *served or furnished* " by retailers. *See* § 39–26–104(1)(e) (emphasis supplied).

Further, the department has failed to identify any tax that was ever levied in Colorado upon the gifting of food. Because we must presume that the General Assembly intended to accomplish some reasonable result when it enacted § 40–20–109, we cannot adopt this strained interpretation that the department would place upon it. *See Conte v. Meyer,* 882 P.2d 962 (Colo.1994) (it must presumed that statute intends a just and reasonable result; construction that leads to absurd result will not be adopted).

■ Second, the department argues, apparently in the alternative, that the exemption statute applies only to sales made *to* the railroad and not to sales made *by* it. However, the statute prohibits the requirement for a license or a tax upon the activity of furnishing or serving food "*to passengers* upon any railroad train ...." (emphasis supplied) Clearly, therefore, this statute cannot refer to furnishing food or drink to the railroad itself; the railroad is not a "passenger."

Arguably, the statute could be interpreted to apply to *any* "person or corporation," so that it might apply to third-party vendors selling food commodities to passengers on a railroad train, either when the train is stopped at a station or when it is in motion. However, even if the statute could bear this meaning, the term "person or corporation" would, nevertheless, also include the railroad itself.

■ The department's final argument with respect to the proper interpretation of § 40–20–109 has more substance. Noting that that statute was adopted in 1891 and that, when the sales tax statute was adopted in 1935, the latter statute did not expressly incorporate the exemption provisions of the earlier statute, the department argues that, to the extent of any inconsistency between

the two, it must be the terms of the sales tax statute that prevail.

This principle finds general support in *Colorado Department of Revenue v. Woodmen of the World,* 919 P.2d 806 (Colo.1996); *Security Life & Accident Co. v. Heckers, supra;* and *Southwest Catholic Credit Union v. Charnes,* 665 P.2d 626 (Colo.App.1982). In each of these cases, it was held that a statute generally exempting a specific class from all taxes was not intended to exempt that class from the collection and payment of sales taxes if the sales tax statute did not itself contain such an exemption. *See also* Annot., *Sale or use tax as within tax exemption provisions of statutes other than those imposing such taxes,* 1 A.L.R.2d 465 (1948).

*Colorado Department of Revenue v. Woodmen of the World, supra,* interpreted § 10–14–102, C.R.S.1998, originally adopted in 1911, which provides that a fraternal benefit society "shall be exempt from all and every ... tax, other than taxes on real estate and office equipment."

The statute involved in *Security Life & Accident Co. v. Heckers, supra,* was § 10–3–209, C.R.S.1998, adopted in 1907, which levies a tax on all premiums collected by insurance companies in this state, but which provides that that tax "shall constitute all taxes collectible under the laws of this state," with certain specific exceptions.

Finally, in *Southwest Catholic Credit Union v. Charnes, supra,* the division construed § 11–30–123, C.R.S.1998, originally enacted in 1931, which grants to credit unions a blanket exemption from "taxation except as to real estate owned."

In each of these cases, it was held that the general exemption statute did not operate to exempt the taxpayer from paying or collecting sales taxes under the later 1935 sales tax statute. The rationale for this conclusion is best articulated in *Woodmen of the World.* There, it was said that a statute generally exempting an organization from liability for all taxes will not be considered as an exemption from liability for a tax that was not in existence at the time that the exempting statute was adopted, unless the later taxing statute incorporates that exemption. This is

so for several reasons, including the fact that the General Assembly enacting the earlier exemption statute could not have contemplated taxes not then being levied.

While the principle adopted in these previous decisions supports the department's position here, there are significant differences between § 40–20–109 and the statute at issue in each of those cases. And, we conclude that these differences make that principle inapplicable here.

First, in each of those cases, the purpose for the exemption was different from the discernible purpose underlying § 40–20–109. In each of those cases, the exemption was granted either because of the nature of the exempted entity, a fraternal benefit society in *Woodmen of the World* and a credit union in *Southwest Catholic Credit Union,* or in consideration of a special tax levied on the class of taxpayers described in *Security Life & Accident Co.*

Here, while there may be no direct evidence of the underlying purpose for § 40–20–109, it is reasonable to assume that that purpose was to alleviate the accounting and bookkeeping burdens that would be placed upon a vendor to determine the venue of each retail sale made by it during the course of a moving passenger train's progression through a series of counties and municipalities and to make a return of the taxes collected in each of those jurisdictions. Given this underlying purpose, the General Assembly's intent to alleviate this administrative burden would be equally applicable to any future tax that might be levied upon this activity.

Further, the nature of the exemption here differs from the exemption statutes interpreted in the earlier cases. Each of those statutes created a *general* exemption from the payment of *all* taxes, without further description. Hence, the reference to "all taxes" logically had reference to taxes in existence at the time of enactment of each of those statutes and not to taxes that were then unknown. Indeed, the supreme court in *Woodmen of the World* noted that a sales tax was unknown at the time of the adoption of the exemption statute at issue there. *See also Connecticut Light & Power Co. v. Walsh,* 134 Conn. 295, 57 A.2d 128, 1

A.L.R.2d 453 (1948) (sales tax unknown in 1915). Under those circumstances, it would be difficult to conclude that a previous blanket exemption was intended to apply to such a tax.

In contrast, the statute here does not contain a general exemption from taxation; its exemption is narrowly drawn and applies only to a specific activity. Neither of the parties here have explained what specific taxes were in existence in 1891 to which § 40–20–109 might have been applied at that time. Even if we assume it to be historically accurate that an excise tax on retail sales was unknown in 1891, it would, nevertheless, be difficult to provide a better description of the activity upon which a sales tax is presently levied than that of the exempted activity described in § 40–20–109.

Finally, because of the specificity of the exempting statute and its clear facial application to the activity described in the sales tax statute, the general provisions of § 39–26–114(1)(a)(III), exempting from the sales tax all "sales" that the state is prohibited from taxing under the "laws of ... the State of Colorado," assumes much greater significance here than it does with respect to the question of the application of a general exemption statute that makes no reference to any specific activity. *Cf., e.g., Woodmen of the World, supra.* Indeed, if this provision is to be given any meaning, it must be held to apply to those statutes in existence at the time of the enactment of the sales tax statute, such as § 40–20–109, which specifically exempted from taxation particularly described retail sales. Hence, while § 39–26–114(1)(a)(III) was of little aid in construing the general statutes at issue in the three earlier cases, it would seem to have particular application to the specific activity described in § 40–20–109.

Given all of these considerations, therefore, we agree with the trial court that the principle adopted in the earlier jurisprudence is inapplicable to the exemption statute under consideration here. We conclude, rather, that, on its face, § 40–20–109 grants an exemption to the railroad from taxation of the food and drink sales made to its passengers in its rail cars and that the later adoption of the sales tax statute did not have the effect of repealing or modifying this exemption. Hence, we affirm the trial court's resolution of this issue.

## II. *The Tourism Tax*

The tourism tax statute, which was repealed because of the citizens' failure to approve it, *see* Colo. Sess. Laws 1993, ch. 352, levied two taxes that are the subject of this appeal.

## A.

The first tax levied was an additional sales tax "imposed on the purchase price paid or charged to any person for food and drink sales." Colo. Sess. Laws 1993, ch. 352, § 39–26.1–102. For the reasons outlined above, we conclude that § 40–20–109 exempted the railroad from the requirement of collecting or paying this tax.

## B.

The second tourism tax was levied upon the sale of a "ticket or other charge allowing admission to or participation in any private tourist attraction." Colo. Sess. Laws 1993, ch. 352, § 39–26.1–104(1). For this purpose, the statute defined a private tourist attraction as:

> any commercial entity which appeals to the recreational desires and tastes of the traveling public through the presentation of services or devices designed to entertain or educate visitors, including but not limited to:
>
> . . . .
>
> (j) Rides on ... *scenic railroads* ...
>
> except that common carriers subject to the fare tax imposed by section 39–26.1–106 are not included in this subparagraph (j) . . . . (emphasis supplied)

The statute referred to in § 39–26.1–104(1)(j), *i.e.,* § 39–26.1–106, levied a "fare tax" on tickets for passage on "tour buses and other *common carriers* engaged in transporting passengers for sightseeing purposes." (emphasis supplied)

The trial court's conclusion that the railroad was not subject to this tax was based upon an analysis that focused upon the term "private tourist attraction" and the differences between a "common" carrier and a "private" carrier. It held that, because the railroad is a *common* carrier, it could not be a "private" tourist attraction. Before us, the railroad asserts that, because it does not operate its line exclusively for amusement purposes, but is a public utility providing a transportation service, it is neither a "private tourist attraction" nor a "scenic railroad" of the type to which the General Assembly intended the tourist tax to apply. We disagree with both analyses.

■ First, the express provisions of §§ 39–26.1–104(1) and 39–26.1–106 make clear that the General Assembly intended the term "private tourist attraction" to include at least some common carriers. Indeed, § 39–26.1–106 is specific in levying a tax on "common carriers engaged in transporting passengers for sightseeing purposes." Hence, the word "private" cannot be interpreted to refer only to private carriers and to exclude common carriers.

Further, other legislation referring to a "scenic railroad" confirms the common sense interpretation of the word "private" as distinguishing between privately-owned enterprises and publicly-owned tourist attractions. The only other time that the General Assembly has used the term "scenic railroad" was when it ratified the compact between Colorado and New Mexico in which those two states jointly agreed to acquire and to operate the "Cumbres and Toltec Scenic Railroad," a previous privately-owned interstate narrow gauge rail line operating in Rio Arriba County in New Mexico and in Archuleta and Conejos Counties in Colorado. *See* § 24–60–1701, et seq., C.R.S.1998, and § 24–60–1901, et seq., C.R.S.1998.

Given this prior use of the term, it is manifest that, when the General Assembly used the same term in the tourism tax statute, it was envisioned that this term was to include rail carriers of passengers between two geographic points along a rail line and was not intended to be limited to amusement rides, such as the Pikes Peak funicular or the Georgetown Loop, as the railroad argues.

The tourism tax does distinguish between the two types of rail lines. If the line is a "scenic railroad," but is not a common carrier, it is subject to the tax levied by § 39–26.1–104(1)(j); if it is a common carrier, it is taxed under § 39–26.1–106. In *either* case, however, if it is a scenic railroad, it is subject to the tourism tax.

■ Finally, nothing in the definition of "private tourist attraction" or in the concept of a "scenic railroad" would exclude from that definition or concept a rail line whose principal appeal is to the "recreational desires and tastes of the traveling public," simply because a minute portion of the public served by it uses it for other purposes, as well.

Here, 99% of the railroad's revenues come from passenger fares, and while the railroad submitted no specific information upon the subject, the only fair inference that may be drawn from its factual submissions is that the substantial majority of those revenues are paid by passengers making the 90-mile round trip venture on a narrow gauge rail line for recreational, entertainment, or educational purposes. Indeed, the fact that the railroad sells souvenirs to those passengers, as well as the nature of the articles sold, confirms these purposes.

We conclude, therefore, that the railroad is both a "private tourist attraction" and a "scenic railroad," and because it is a common carrier, it was facially subject to the tax levied by the now-repealed § 39–26.1–106.

### C.

■ The railroad argues in the alternative, however, that, if the tourism tax is interpreted to apply to its operations, the provisions of the federal Railroad and Regulatory Reform Act of 1976 bar the department from collecting that tax. With this assertion, we agree.

Among the provisions of this federal act is § 306, now codified as 49 U.S.C. § 11501 (1994), which prohibits any state from undertaking certain described acts which the Congress concluded "unreasonably burden and

discriminate against interstate commerce." These acts are described in 49 U.S.C. § 11501(b)(1994) and consist of:

— assessing a railroad's property for tax purposes at a higher ratio to its fair market value than is the property "of the other commercial and industrial property in the same assessment jurisdiction...." 49 U.S.C. § 11501(b)(1)(1994).

— levying any tax based upon any such assessment; 49 U.S.C. § 11501(b)(2)(1994).

— levying or collecting an ad valorem tax at a rate exceeding that applicable to "commercial and industrial property in the same assessment jurisdiction...." 49 U.S.C. § 11501(b)(3)(1994); and

— imposing *"another tax* that discriminates against a rail carrier...." 49 U.S.C. § 11501(b)(4)(1994). (emphasis supplied)

For purposes of these provisions, "commercial and industrial property" includes all property devoted to "a commercial or industrial use and subject to a property tax levy," except land used primarily for agricultural purposes. 49 U.S.C. § 11501(a)(4)(1994).

Clearly, the tourism tax at issue here is not an ad valorem tax, and therefore, those provisions of 49 U.S.C. § 11501(b) speaking to such a tax are not directly applicable to this controversy.

Nevertheless, contrary to the department's argument that the "other tax" referred to in 49 U.S.C. § 11501(b)(4) is only a reference to other ad valorem taxes, it has been held, substantially uniformly, that this latter statute also includes other taxes, such as excise taxes. *Trailer Train Co. v. Bair,* 765 F.2d 744 (8th Cir.1985), *cert. denied,* 474 U.S. 1021, 106 S.Ct. 572, 88 L.Ed.2d 556 (1985). *Accord Kansas City Southern Railway Co. v. McNamara,* 817 F.2d 368 (5th Cir.1987); *Atchison, Topeka & Santa Fe Railway Co. v. Bair,* 338 N.W.2d 338 (Iowa 1983). *See Department of Revenue v. ACF Industries, Inc.,* 510 U.S. 332, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994) (exemption of specific industries from general ad valorem tax is not "another tax" under 49 U.S.C. § 11501(b)(4)).

Further, in determining whether a tax is discriminatory under 49 U.S.C. § 11501(b)(4), generally, the class against which the railroad must be compared is *not* just the class that is subjected to the tax. Rather, the comparison must be between the railroad and the whole class of "commercial and industrial property," as defined in 49 U.S.C. § 11501(a)(4).

In *Department of Revenue v. ACF Industries, Inc., supra,* 510 U.S. at 346, 114 S.Ct. at 851, 127 L.Ed.2d at 177, the Supreme Court concluded that the mere grant to some other parties of a limited exemption from an ad valorem tax that was generally applicable to all commercial and industrial properties within the state did not result in the levy of "another tax" under § 11501(b)(4), so long as the exemption was not so broad as to levy the tax upon the railroad "alone or as a part of some isolated and targeted group." In reaching this conclusion, however, it specifically recognized that the class to which comparison is to be made under § 11501(b)(4) is the same overall class to which § 11501(b)(1) and § 11501(b)(3) make reference, *i.e.,* "commercial and industrial property in the same assessment jurisdiction."

Based upon this analysis in *ACF Industries,* the Court of Appeals for the Tenth Circuit has more recently concluded that the exemption from ad valorem taxes upon intangible personal property granted to all taxpayers, except to public utilities as defined in prior Colorado statutes, is a discriminatory "another tax" under § 11501(b)(4). In reaching this conclusion, the court considered that the defined class was so limited, as compared to all other commercial and industrial properties within the state, that the tax was necessarily discriminatory. *Burlington Northern R.R. Co. v. Huddleston,* 94 F.3d 1413 (10th Cir.1996).

More significantly, perhaps, in *Trailer Train Co. v. State Tax Commission,* 929 F.2d 1300 (8th Cir.1991), *cert. denied,* 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 133 (1991), the court held that a special excise tax on rental revenue received from railroads by the lessors of rail cars was unlawful as "another tax" under § 11501(b)(4). The court concluded that, in assessing the discrimina-

**216**

ry nature of the tax, it is unnecessary to consider the effect of the entire tax structure of a state. Rather, at least in those instances in which the tax is levied only upon a small group of taxpayers, it is necessarily discriminatory on its face.

To apply the test adopted by this jurisprudence, therefore, we must determine, considering the entire group of commercial and industrial properties within this state, whether an excise tax levied only on those taxpayers ·who are engaged in operating "tourist attractions," as defined, is imposed upon such a limited group as to be discriminatory under § 11501(b)(4). We conclude that the group is so limited.

The group is broader than that at issue in *Trailer Train Co. v. State Tax Commission, supra.* However, it would appear to be a more limited class than that defined by the pertinent statute in *Burlington Northern R.R. v. Huddleston, supra,* which included, in addition to railroads, all airline companies, electric companies, rural electric companies, telephone companies, telegraph companies, gas companies, gas pipeline carriers, domestic water companies, pipeline companies, coal slurry companies, and private car line companies.

In any event, given the required comparison, unless the excise tax is levied upon such a large group of commercial and industrial taxpayers that it may be said to be a general levy, the conclusion that the levy is discriminatory is mandated. Certainly, the levy here is far from a general one.

The department argues, nevertheless, that the tourism tax, like the sales tax, is not one levied on the railroad and that it is, therefore, not barred by § 11501(b)(4). We disagree.

The tourism tax statute adopted the same means for collection as the sales tax statute uses. And, like the sales tax statute, it made the railroad liable and responsible for collecting and paying the same. Colo. Sess. Laws 1993, ch. 352, § 39-26.1-107, et seq. Indeed, the tourism tax statute adopted the same administrative procedures, and presumably, therefore, the same definitions, as are adopted by the sales tax statute. Colo. Sess.

Laws 1993, ch. 352, § 39-26.1-110. By making the railroad "liable" for the amount of the tax, defining the railroad as a "taxpayer," and labeling the amount to be paid by it as a "tax," the tourism tax statute made its levy subject to the anti-discrimination provisions of § 11501(b)(4).

The judgment is affirmed.

Judge PLANK and Judge KAPELKE concur.